UNITED STATES of America, Appellee,

v.

Donald V. COSTANZO, Appellant.

UNITED STATES of America, Appellee,

v.

Scott A. CLAWSON, Appellant.

UNITED STATES of America, Appellee,

v.

Anthony Thomas CIVELLA, Appellant.

Nos. 92–2665, 92–2720 and 92–2841.

United States Court of Appeals,
Eighth Circuit.

Submitted March 16, 1993.

Decided Sept. 13, 1993.

Rehearing Denied Oct. 8,
1993 in No. 92–2720.

Frank A. White, Kansas City, MO, argued for Castanzo; Robert Beaird, Kansas City, MO, argued for Clawson; Oscar Goodman, Las Vegas, NV, argued for Civella. (Robert G. Duncan, and Ronald Partee, on the briefs).

Bruce E. Clark, Kansas City, MO, argued, for appellee (Jean Paul Bradshaw II and Sheryle L. Jeans, on the brief).

Before JOHN R. GIBSON, Circuit Judge, BRIGHT, Senior Circuit Judge, and BOWMAN, Circuit Judge.

BOWMAN, Circuit Judge.

Donald Costanzo, Scott Clawson, and Anthony Civella appeal from their convictions in the District Court [1] on an array of mail fraud, wire fraud, and transportation of stolen goods charges. *See* 18 U.S.C. §§ 1341, 1343, 2314 (1988). Civella also appeals from his sentence. For the reasons set forth below, we affirm.

I.

The charges in this case arise out of a scheme to "divert" pharmaceuticals. Costanzo, Clawson, and Civella controlled a number of institutional pharmacies (that is, pharmacies that provided medication to patients in institutional settings such as nursing homes) in the Kansas City area. The scheme for which they were prosecuted involved the purchase of pharmaceuticals by these pharmacies and the subsequent resale of the drugs to a pharmaceutical wholesaler. It resulted from a particular opportunity available to institutional pharmacies: namely, drug manufacturers sell pharmaceuticals to institutional pharmacies at prices that may be as low as twenty-five percent of the prices at which the companies sell drugs to other customers. Defendants were able to garner large profits merely by reselling to a wholesaler drugs purchased from manufacturers at institutional prices.

One reason that drug manufacturers offer institutional pharmacies low prices is that manufacturers recognize that the amount that insurance companies and the government, which pay for many of the patients in institutions, will reimburse for pharmaceuticals is relatively low. In addition, drug manufacturers want doctors in institutions to be able to prescribe the manufacturer's drugs, since this increases the chances that the doctors will prescribe the same drugs to patients the doctor sees in other contexts. Finally, manufacturers hope that patients who are treated with a certain drug in an institutional setting will continue to use that particular medication after they are released from the institution.

In order to ensure that the sale of deeply discounted drugs to institutional pharmacies

---

1. The Honorable Howard F. Sachs, Senior United States District Judge for the Western District of Missouri.

does not undermine their ability to sell to other purchasers at normal wholesale prices, manufacturers include what are known as "own-use clauses" in the contracts under which they sell drugs to institutional pharmacies. These clauses provide that drugs purchased at institutional prices may be dispensed only to patients in institutional settings. The clause used by Ciba–Geigy Corporation, the drug manufacturer involved in most of the instances of diversion for which defendants were charged, is fairly typical and provides that:

> Products purchased from CIBA–GEIGY at other than standard prices or terms are to be used exclusively for long term care facility inpatients for whom we are the pharmacy provider. Any other use of these products will be cause for immediate termination of this account as well as any pricing Agreements then in force with CIBA–GEIGY.

Ciba–Geigy Corp., Long Term Care Facilities Provider Account Application (Exhibit 721).

Defendants' actions in purchasing drugs at institutional prices and reselling them to pharmaceutical wholesalers are referred to as a "diversion" because drugs were diverted from the nursing home inpatients contemplated in institutional buying contracts to other persons. Apparently, no federal law expressly proscribes drug diversion *per se*. Thus, the government prosecuted defendants for mail fraud, wire fraud, and transportation of stolen goods in violation of 18 U.S.C. §§ 1341, 1343, 2314. Central to the charges was the claim that defendants defrauded drug manufacturers by obtaining pharmaceuticals at highly discounted prices by falsely representing that the pharmaceuticals would be used solely by nursing home patients, although defendants intended all the while to divert the drugs to wholesalers in violation of the own-use restrictions.

## II.

The events underlying this case began in 1985 when Costanzo[2] and John Sansone formed a partnership with Lou Ferro, Sr., and Lou Ferro, Jr., to start an institutional pharmacy servicing nursing homes in Kansas City. The Ferros already owned a retail pharmacy in Kansas City named Penn Park Pharmacy, and the new partnership began to serve patients in nursing homes, as well as members of the general public, out of this pharmacy. Although the pharmacy was providing drugs to patients in institutional settings, it was not purchasing drugs at institutional prices. Business grew rapidly and before long Clawson was hired as an additional pharmacist.

In 1986, Costanzo, Sansone, and both Ferros travelled to Las Vegas to investigate the possibility of opening another pharmacy to service a nursing home there. While in Las Vegas, they met Wilbur Swift and Martin Rubin, the owners of B.W. Wholesale, a pharmaceutical wholesaler that specialized in purchasing diverted pharmaceuticals. Swift suggested that Penn Park Pharmacy purchase drugs at institutional prices and resell them to B.W. Wholesale. Swift offered to pay Penn Park Pharmacy the cost of diverted pharmaceuticals plus a twenty-five percent markup and to pay all shipping costs. Swift said that diversion was legal, but that the pharmacy should not sign an own-use clause or B.W. Wholesale would not be able to purchase diverted pharmaceuticals from it.

After returning from Las Vegas, Costanzo asked Ferro, Jr., to investigate Swift's proposal. Ferro, Jr., attended a trade convention in New Orleans and spoke with representatives of pharmaceutical companies who informed him that Penn Park Pharmacy could purchase pharmaceuticals at institutional prices for its institutional patients. These representatives also told him that pharmacies could only purchase drugs at institutional prices if they signed own-use clauses and that these clauses prohibited the resale of the pharmaceuticals. Ferro, Jr., relayed this information to Costanzo and said that he did not believe that they should resell

---

**2.** During most of the transactions underlying this case Costanzo appears to have represented a group of four or five investors of whom he was one. None of the other investors played an active role in the transactions, and none was prosecuted by the government. For simplicity, we refer to Costanzo's actions on behalf of this group as his own actions.

pharmaceuticals purchased at institutional prices.

In December 1986, Penn Park Pharmacy applied to join GeriMed, a buying group through which institutional pharmacies purchase drugs from manufacturers at institutional prices. To satisfy GeriMed's membership requirements, the pharmacy had to conduct its institutional business out of a location separate from its retail business. Therefore the partnership opened up a pharmacy named Penn Park Institutional Pharmacy ("Penn Park") at a new location. Shortly after this institutional pharmacy was opened, Costanzo and Sansone quarreled with the Ferros and the partnership was dissolved—the Ferros kept the retail pharmacy they originally had owned, and Costanzo and Sansone took the institutional pharmacy. Clawson also moved to the institutional pharmacy.

Following the split, Sansone executed institutional pricing contracts and credit applications on behalf of Penn Park with a number of individual drug manufacturers. Like the contract that the pharmacy executed with GeriMed, these agreements contained own-use restrictions so clearly set forth that anyone perusing the typically one-page agreements would recognize the restriction. Nevertheless, Sansone told Clawson and Robert Shuey, the other pharmacist at Penn Park, that he was planning to purchase drugs through the pharmacy and resell them to a wholesaler. Sansone also told Clawson and Shuey that this was a grey area under the law and asked them not to tell anyone about the diversion.

In the late spring of 1987, the actual drug diversion began. Sansone controlled the operation on Penn Park's end. The decision of what drugs to order for purposes of diversion, however, was based on purchase orders submitted to Penn Park by B.W. Wholesale. These purchase orders were structured to prevent drug manufacturers from detecting the diversion, principally by limiting the quantities of drugs ordered to quantities that B.W. Wholesale thought would not provoke suspicion. Although Penn Park was servicing some nursing homes, and therefore legitimately purchasing some drugs for its own use, the vast majority of the drugs Penn Park purchased once the diversion began were merely repackaged and shipped to B.W. Wholesale.

In September 1987, managers at G.D. Searle & Co. ("Searle"), a pharmaceutical manufacturer from which Penn Park was purchasing drugs, began to question the large quantities and the unusual assortment of drugs that Penn Park was purchasing. Searle requested that Penn Park provide an audit of the drugs that Penn Park had purchased from Searle. Penn Park initially failed to provide the requested information, and Searle suspended the pharmacy's institutional pricing privileges.

Clawson then conceived the idea of creating fake drug utilization reports for nonexistent institutional patients that would show that the drugs purchased from Searle had been prescribed to these patients. Under Clawson's direction, an extensive effort to create fake drug utilization reports began. Several people worked keying patient profiles into the pharmacy's computer from 10:00 p.m. to 3:00 a.m. for three or four nights in a row, and the fake drug utilization reports then were submitted to Searle. The reports, however, failed to account for anywhere near the quantity of pharmaceuticals that Penn Park had purchased from Searle, and Searle terminated its contract with Penn Park. GeriMed too ended its relationship with Penn Park.

In December 1987, Sansone committed suicide. Thereafter Clawson ran Penn Park, including the diversion operation. In early 1988, the Missouri Board of Pharmacy conducted an audit of Penn Park. Wilson Winch, the auditor, determined that over ninety percent of the twenty drugs audited was unaccounted for (for a total of 770,000 missing pills of those twenty drugs alone). When Winch questioned Clawson, Clawson said that Penn Park was able to obtain institutional pricing because it serviced only nursing home patients. Clawson denied knowledge of any drugs being diverted to a wholesaler, saying that Sansone ran the business office and that he himself had nothing to do with that office. Winch's investigation was referred to the FBI.

In the spring of 1988, Sansone's heirs and Costanzo decided to sell Penn Park to Harvey Haynes. During and after negotiations for this sale, Costanzo and Clawson attempted to persuade Haynes to participate in diverting drugs, but Haynes repeatedly refused, insisting that such activity was illegal. The dialogue concerning the legality of diversion appears to have revolved principally around federal statutes regulating the pharmaceutical industry rather than around the own-use clauses in Penn Park's contracts. At one meeting attended by Clawson, however, Haynes's attorney said that signing a contract containing an own-use clause, intending all the while to violate the clause, could be considered fraud. The attorney subsequently repeated this opinion at a meeting attended by Costanzo. Following the sale of Penn Park to Haynes, diversion stopped at Penn Park. Shortly thereafter, Haynes fired Clawson.

Following his discharge at Penn Park, Clawson established a new institutional pharmacy named Care Pharmacy ("Care"). The earliest connections between Civella and diversion arise out of the establishment of Care. Clawson told an acquaintance that Sansone's widow's family was helping him finance Care; Sansone's widow, Fanny Jo Sansone, is Civella's daughter. In addition, by the time Care was founded, Swift and Rubin, the owners of B.W. Wholesale, had parted ways. Swift and Rubin became involved in a bidding war to obtain Care's diversion business that resulted in Rubin getting Care's business and in the markup Care earned on diverted pharmaceuticals increasing to forty percent (as compared to the twenty-five-percent markup at Penn Park). The determining factor in the decision of whether to deal with Swift or Rubin, however, does not appear to have been price; when Swift asked why he had not received Penn Park's business, Costanzo said that "the number one person in Kansas City liked Marty [Rubin] and thought he was a good kid and wanted to give him a chance." Transcript at 598.

Clawson travelled to Las Vegas to discuss the establishment of Care's diversion operation with Rubin. Rubin told Clawson that he should not use the mails or wires in executing the diversion, since to do so was illegal. Rubin understood that using the mails or wires in executing the diversion scheme could be mail fraud or wire fraud; it is not clear, however, that he communicated this reasoning to Clawson. Upon returning to Kansas City, Clawson executed, on behalf of Care, an application to purchase pharmaceuticals from Ciba–Geigy at institutional prices; this one page application contained a boxed, bold-faced own-use agreement. Care, however, never had a business location and never served any patients; rather, Care operated out of Clawson's residence and diverted all of the drugs it purchased. The vast majority of the drugs diverted by Care were Ciba–Geigy drugs.

The Ciba–Geigy salesman with whom Clawson dealt, Wilbur Dannar, was an experienced salesman who should have recognized from the quantity and selection of drugs Care was ordering that Care was diverting. This is particularly true since Dannar personally called Care's orders in to Ciba–Geigy, something Dannar did not do for his other customers. Dannar also would have known that Ciba–Geigy would not allow pharmaceuticals to be shipped to a residence that necessarily would lack appropriate storage facilities. Dannar ultimately was fired by Ciba–Geigy in 1991 as a result of his involvement in, or failure to detect, the diversion operation at Care and at the other institutional pharmacies operated by Costanzo, Clawson, and Civella. Dannar testified before the grand jury but died ten days before the trial of this case began.[3]

In early 1989, Kian Shafe, a friend of Costanzo's, opened yet another institutional pharmacy, Kendallwood Pharmaceutical Company ("Kendallwood"). Clawson, who was hired as Kendallwood's pharmacist, told Rubin that this pharmacy was being opened to allow more drugs to be diverted without attracting the notice of drug manufacturers.

---

**3.** According to Dannar's death certificate, Dannar died of an accidental self-inflicted gunshot wound to the abdomen.

At a meeting attended by Costanzo, Clawson, Civella, and Shafe, it was agreed that profits from the diversion operations at Care and Kendallwood would be divided with Costanzo, Clawson, and Fanny Jo Sansone's family receiving twenty-five percent each, Shafe receiving fifteen percent, and Carl Artese (a co-defendant whose case resulted in a hung jury) receiving ten percent. Clawson was to handle the diversion operation at both pharmacies. Under his direction, Kendallwood, like Care, dealt with Dannar at Ciba–Geigy, executed an application (containing an own-use clause) to purchase pharmaceuticals from Ciba–Geigy at institutional prices, and diverted all of the drugs it purchased. As at Care, the vast majority of the drugs diverted were Ciba–Geigy drugs.

Tape recordings made by law enforcement personnel of phone calls to and from Civella's residence in the spring of 1989 substantiate Civella's involvement in the diversion operation. In one conversation, Clawson said that he needed to write Civella a check and arranged a meeting with him. Police monitoring the meeting observed Clawson write a check and hand it to Civella; although no check written by Care to Civella himself was discovered, Clawson wrote a check on Care's account to Vince Civella, Civella's son, on the date of the meeting. In a second conversation, that was redacted before being played to the jury to exclude privileged statements, Clawson and Civella discussed the own-use clauses in the pharmacies' contracts. Finally, in a third conversation that followed a disagreement among Clawson, Shafe, and Artese over whether Artese's name should be added to the Care account, Civella told Clawson not to add Artese's name.

The diversion operation at Penn Park, Care, and Kendallwood was responsible for the diversion of a large quantity of pharmaceuticals. The government identified checks written by B.W. Wholesale and an affiliated company for pharmaceuticals diverted by Penn Park in the approximate amount of $814,000, and for pharmaceuticals diverted by Care and Kendallwood in the approximate

amount of $309,000; thus defendants received payments for diverted pharmaceuticals in the approximate amount of $1,123,000. Based on the twenty-five-percent markup earned at Penn Park and the forty-percent markup earned at Care and Kendallwood, the profits from the diversion operation would have been roughly $251,000.[4]

Throughout the events discussed above, defendants seem to have had concerns and discussions about the legality of diversion. At meetings held around the sale of Penn Park in which Costanzo and Clawson attempted to persuade Haynes to continue diverting, the issue of legality arose repeatedly. Although Haynes maintained that diversion was illegal, Arvid Zuber, an attorney representing the sellers, stated at a meeting attended by Clawson but not by Costanzo that diversion was legal. Zuber conceded that diversion had to be hidden from manufacturers; he claimed that manufacturers were primarily interested in selling their products, only included own-use clauses in contracts because they were required to do so by law, and would not worry about diversion that was not flagrant.

In 1989, defendants had a series of discussions regarding the effect of pending federal legislation on the legality of diversion. Clawson asked Rubin to come to Kansas City to meet the partners in Care and Kendallwood and discuss the issue. Rubin met Costanzo, Clawson, Civella, Shafe, Artese, and an attorney who represented Civella at the Airport Hilton in Kansas City. The final result of the meeting was that Civella's attorney would await an opinion from Rubin's attorney regarding the legality of diversion. No mention was made of own-use clauses at the Airport Hilton meeting. Moreover, the opinion that Rubin's attorney ultimately provided to Civella's attorney was simply a response by the FDA to a question posed regarding the legality of reselling pharmaceuticals; in asking the question, Rubin's attorney deliberately had avoided any mention of own-use restrictions.

4. The government calculates defendants' profit as $320,000 by multiplying the amounts of the checks written by B.W. Wholesale by 25% or 40% as appropriate. But the aggregate value of the checks written by B.W. Wholesale includes the markups, see Transcript at 1374; thus, the government's calculation is incorrect.

## III.

■ Civella argues that the trial judge erred in admitting Swift's testimony that when Swift asked why he had not received Care's diversion business, Costanzo replied that "the number one person in Kansas City liked Marty." Civella asserts that this testimony conjured up images of the Mafia and thus unfairly prejudiced him. *See* Fed. R.Evid. 403 (stating that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice"). We review the trial court's decision to admit the statement for abuse of discretion. *See United States v. Turpin,* 707 F.2d 332, 336 (8th Cir.1983).

Costanzo's statement clearly had significant probative value: it showed that Costanzo no longer was in charge of the diversion operation, and that someone else was calling the shots. Considering the other evidence, the inference that the prosecution hoped the jury would draw is that Civella was that person. Since Civella had less day-to-day involvement in the diversion operation than did his co-defendants, and since the government therefore was able to substantiate his intent to defraud less thoroughly, evidence that Civella was exercising control over the operation was important to the government's case against him.

The question then is whether the statement's unfair prejudicial impact substantially outweighed its probative value. Although Civella is quick to see a reference to the Mafia in Costanzo's statement, there is no reason to believe that the jury would infer this; nothing in the statement suggests that it referred to any entity larger than the diversion operation. The trial court was careful throughout the trial to prevent any mention of the Mafia or the mob and thus did all that it could to prevent the testimony from having any unfairly prejudicial impact.

We hold that the District Court did not abuse its discretion in allowing Swift to testify about Costanzo's remark.

## IV.

The principal challenge that defendants raise on appeal is to the sufficiency of the evidence. In reviewing guilty verdicts, "we view the evidence in the light most favorable to the government, giving the government the benefit of all inferences that reasonably may be drawn from the evidence." *United States v. Drews,* 877 F.2d 10, 13 (8th Cir. 1989). We will affirm a defendant's conviction if the evidence was "sufficient to convince the trier of fact beyond a reasonable doubt that the defendant is guilty." *United States v. Schubel,* 912 F.2d 952, 955 (8th Cir.1990). Reviewing each defendant's convictions under this standard, we conclude that there was sufficient evidence to support the convictions.

Defendants do not deny the existence of the diversion operation underlying this case or that they were involved in the diversion. Rather, each defendant challenges the sufficiency of the evidence as to his intent to defraud, an essential element under the mail fraud, wire fraud, and interstate transportation of stolen goods statutes under which defendants were convicted. *See* 18 U.S.C. §§ 1341, 1343, 2314; *see also United States v. Faulhaber,* 929 F.2d 16, 18 (1st Cir.1991); *United States v. Clausen,* 792 F.2d 102, 105 (8th Cir.), *cert. denied,* 479 U.S. 858, 107 S.Ct. 202, 93 L.Ed.2d 133 (1986). Initially, we reject defendants' argument that the fact that they consulted with attorneys and were informed that diversion was not illegal insulates them from criminal liability. The critical inquiry is not whether defendants intended to break the law, but, rather, whether they intended to defraud drug manufacturers.[5]

---

**5.** Even if a good faith belief that diversion was legal were enough to insulate defendants against criminal liability, we would be hard pressed to find such a belief in this case as a matter of law. Defendants rely on Zuber's pronouncement that diversion was legal and on the opinion furnished by Rubin's attorney after the Airport Hilton meeting that diversion was legal to support their asserted belief in the legality of their actions.

But defendants were told that their actions were illegal by other persons on numerous occasions: for instance, Haynes's attorney told both Costanzo and Clawson that their actions were illegal and explained why this was so. In addition, Rubin testified that the Airport Hilton meeting was merely "a charade." Transcript at 1273. A reasonable jury could have found that defendants were more concerned with being "legally cov-

■ The record contains overwhelming evidence of Costanzo's and Clawson's intent to defraud drug manufacturers. Considering Costanzo's case first, several pieces of evidence clearly establish that Costanzo was aware of the own-use restriction and of the fact that diversion violated it. Costanzo was present at the initial meeting with Swift in Las Vegas at which Swift proposed that Penn Park Pharmacy divert but stated that the pharmacy should not sign own-use clauses or B.W. Wholesale would not be able to purchase pharmaceuticals from it. When Costanzo asked Ferro, Jr., to investigate diversion, Ferro, Jr., reported to Costanzo that pharmacies could only buy drugs at institutional prices if they signed own-use clauses and confirmed that such clauses prohibited diversion. Finally, Costanzo attended a meeting regarding the sale of Penn Park to Haynes at which Haynes's attorney pointed out that signing a contract containing an own-use clause, intending all the while to violate the clause, could be considered fraud.

Similarly, Clawson clearly was aware of the own-use restriction because he told Winch that the reason that Penn Park was able to obtain institutional pricing was that it serviced only nursing home patients. Also, like Costanzo, Clawson attended a meeting connected with the sale of Penn Park at which Haynes's attorney pointed out that signing a contract containing an own-use clause, intending all the while to violate the clause, could be considered fraud. Nevertheless, when Searle questioned Penn Park's drug purchases, Clawson conceived and executed a plan to create fake patient profiles and submit them to Searle in an effort to persuade Searle that Penn Park was not diverting. Clawson also executed, on behalf of Care, a one-page application to purchase pharmaceuticals from Ciba–Geigy at institutional prices that contained a boxed, bold-faced own-use agreement. Finally, Clawson told Rubin that the reason that Kendallwood was opened was to allow more drugs to be diverted without attracting manufacturers' attention.

The evidence is less clear regarding Civella's intent. Of the five partners in Care and Kendallwood, however, Civella clearly was the one in charge. His family's share of the profits was as large as anyone else's at twenty-five percent. Neither Costanzo nor Clawson, who also received twenty-five-percent shares, was in charge of the diversion operation: Costanzo's statement about "the number one person in Kansas City" shows that although Costanzo and Sansone may have controlled the diversion operation at Penn Park, Costanzo no longer was calling the shots; and the tapes of Clawson's conversations with Civella show Clawson handling day-to-day business but recognizing Civella's authority on larger issues such as the question of whether Clawson should add Artese's name to the Care account. Shafe and Artese, the final two partners, were latecomers to the diversion operation who clearly did not exercise overall control and each of whom received a smaller portion of the profit than did Costanzo, Clawson, and Civella.

Moreover, the manner in which Civella received money from the diversion operation is significant. Civella argues that he was merely representing his widowed daughter Fanny Jo Sansone's interests after her husband's death when she was unable to look after herself, which would be consistent with Shafe's statement that twenty-five percent of the diversion profits were to go to Fanny Jo Sansone's family (rather than to Civella himself). Money from the diversion operation, however, did not flow only to Fanny Jo Sansone and her children. Although no diversion profits were traced directly to Civella, both Civella's son, Vince Civella, and Civella's granddaughter, Molly Civella, received money from the diversion. Notably, in a phone conversation preceding the meeting with Civella at which Clawson wrote the check to Vince Civella, Clawson told Civella, "I need to write *you* another check." Transcript of conversation between Scott Clawson and Anthony Civella 1 (May 8, 1989) (Exhibit 840a) (emphasis added).

We have noted repeatedly that issues of intent turn largely on the credibility and

ered," Transcript of conversation between Scott Clawson and Anthony Civella 2 (May 17, 1989)

(Exhibit 863a), than with ensuring that their actions were legal.

demeanor of witnesses and thus are "peculiarly the province of the fact finder." *See, e.g., United States v. Reeves*, 730 F.2d 1189, 1195 (8th Cir.1984). This case is no exception. The record clearly supports a finding that Civella controlled the diversion operation, an operation that produced large profits with little work and almost no investment. The reference to own-use clauses in a recorded conversation between Clawson and Civella shows that Civella was aware that Care's and Kendallwood's contracts contained own-use restrictions, although it is not clear how detailed his understanding of such restrictions was. Finally, the manner in which Civella and members of his family received profits from the diversion operation suggests that Civella sought to avoid having the money traced to him. Viewing this evidence, we believe that a reasonable jury could be convinced beyond a reasonable doubt that Civella intended to defraud the drug manufacturers with which Care and Kendallwood dealt. *See United States v. Holm*, 836 F.2d 1119, 1122 (8th Cir.1988) (holding that if the evidence rationally supports two conflicting interpretations, a reviewing court will not reverse a conviction).

We reject two additional arguments that defendants make to support their claims that there was insufficient evidence of their intent to defraud. First, defendants argue that their violations of the own-use clause were so obvious that the failure of Ciba–Geigy to terminate its contracts with Care and Kendallwood must be viewed as a waiver on Ciba–Geigy's part of the own-use restriction. This argument is disingenuous in light of the fact that defendants did their best to conceal the diversion operation from Ciba–Geigy, limiting their orders to quantities of drugs they thought would not be detected and even opening Kendallwood as a separate pharmacy to increase the quantity of drugs that could be diverted without being detected. There was no evidence that any employee of Ciba–Geigy (with the possible exception of Dannar, discussed in the next paragraph) was apprised of the details of the diversion operation or waived the own-use restriction. Rather, the evidence was that institutional pharmacies represented a new market for Ciba–Geigy and that Ciba–Geigy was somewhat slow to implement appropriate protective systems; nevertheless, employees at Ciba–Geigy did discover Care's diversion within a period of months, reported it to the FBI, and subsequently discontinued selling to Care.

Second, defendants argue that even if Ciba–Geigy did not wish to waive the own-use restriction, Ciba–Geigy cloaked Dannar with apparent authority to do so and defendants believed in good faith that Dannar had waived the restriction. Certainly Dannar's involvement as the Ciba–Geigy salesman at all of the diverting pharmacies, the heavy emphasis on Ciba–Geigy products in the diversion and in particular at Care and Kendallwood, and Dannar's firing in the wake of Ciba–Geigy's discovery of the diversion suggest that Dannar may have participated in or approved the diversion of Ciba–Geigy products. The mere fact that a Ciba–Geigy employee may have approved the diversion does not, however, insulate defendants from criminal liability. *See, e.g., United States v. George*, 477 F.2d 508 (7th Cir.) (affirming mail fraud convictions where defendants had paid kickbacks to employee of corporation that defendants were found to have defrauded), *cert. denied*, 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973).

Unfortunately, Dannar's death ten days before the trial prevented the jury from hearing his evidence. In light of defendants' extensive efforts at concealing the diversion operation from manufacturers, including Ciba–Geigy, however, the jury was entitled to reject defendants' argument that defendants had a good faith belief that Dannar had waived the own-use restriction on behalf of Ciba–Geigy. Most tellingly, Clawson told Rubin that the reason defendants established Kendallwood was so that larger quantities of drugs could be diverted without manufacturers noticing. The evidence presented at trial showed that the vast majority of the drugs diverted from Kendallwood were drugs purchased from Ciba–Geigy. If defendants actually had a good faith belief that Dannar had waived the own-use restriction on behalf of Ciba–Geigy, they hardly would have founded Kendallwood to increase the volume of Ciba–Geigy products they were diverting.

In sum, the government produced evidence from which a rational jury could have found beyond a reasonable doubt that each of the defendants participated in the diversion operation with the intent to defraud the drug manufacturers with which they dealt. Thus, the evidence was sufficient to sustain defendants' convictions.

## V.

■ Defendants argue that they are entitled to a new trial based on newly discovered evidence. A criminal defendant is entitled to a new trial on this theory when five prerequisites are met: 1) new evidence has been discovered since the trial; 2) the defendant alleges facts from which the court may infer diligence; 3) the new evidence is not merely cumulative or impeaching; 4) the new evidence is material to the issues involved; and 5) the new evidence would probably produce an acquittal on retrial. *United States v. Begnaud,* 848 F.2d 111, 113 (8th Cir.1988). We review the trial court's decision not to grant a new trial for abuse of discretion. *United States v. Estabrook,* 774 F.2d 284, 290 (8th Cir.1985).

■ The newly discovered evidence on the basis of which defendants seek a new trial is a letter mailed by Rubin to Clawson in the fall of 1989 that informs Clawson that Rubin has been convicted of wire fraud and that Rubin is suspending his diversion business. The letter states, "I strongly believe that my actions were legal and within the scope of the law." Letter from Martin Rubin to Scott Clawson (Sept. 5, 1989) (Document 261, exhibit A). Defendants claim that this self-serving statement in Rubin's letter proves that Rubin perjured himself when he testified that he told defendants that diversion was illegal. We have doubts as to whether this new evidence satisfies several of the prerequisites in our five-part test. We rest our decision, however, on the single ground that this letter probably would not produce an acquittal of any defendant on retrial.

The critical inquiry regarding defendants' guilt is not whether defendants intended to commit a crime but whether they intended to defraud drug manufacturers. Whatever Rubin may have told defendants about

whether drug diversion was legal is tangential to the issue of whether defendants knew of the own-use clauses in the pharmacies' contracts and intended nevertheless to violate these restrictions. The same evidence set forth above that supports defendants' guilty verdicts, none of which stems from what Rubin told defendants about the legality of diversion, would probably produce the same guilty verdicts upon retrial. Because the newly discovered letter would not likely produce an acquittal on retrial, the District Court did not abuse its discretion in denying defendants a new trial.

## VI.

Finally, Civella appeals from the sentence imposed on him by the District Court. Civella was sentenced under guidelines section 2F1.1, which deals with crimes of fraud and deceit. United States Sentencing Commission, *Guidelines Manual,* § 2F1.1 (June 1988) [hereinafter U.S.S.G.]. The District Court calculated Civella's base offense level as six, *see id.* § 2F1.1(a), and applied a seven-level enhancement based on the amount of loss inflicted on drug manufacturers, which the court calculated as $493,275, *see id.* § 2F1.1(b)(1). The court arrived at this figure by calculating the difference between the contract price paid by Care and Kendallwood for the drugs these pharmacies purchased and the normal wholesale price for the drugs. Civella argues that the District Court erred in failing to apply a more favorable methodology that the court subsequently used in sentencing Costanzo and Clawson.

Civella did not object to the amount-of-loss calculation at his sentencing, but he did file a motion seeking a modification of his sentence twenty-three days after his sentencing. This motion, however, was neither authorized by the Federal Rules of Criminal Procedure nor timely. *See* Fed.R.Crim.P. 35(c) (providing that a sentencing court may correct a sentence imposed as a result of an arithmetical, technical, or other clear error within seven days after sentencing); *id.* advisory committee's note ("The authority to correct a sentence under this subdivision is intended to be very narrow.... The subdivision is not in-

tended to afford the court the opportunity to reconsider the application or interpretation of the sentencing guidelines...").

We therefore review Civella's claim for plain error resulting in a miscarriage of justice. *See United States v. Flores,* 959 F.2d 83, 88 (8th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 469, 121 L.Ed.2d 376 (1992). Peter Griffin, a Ciba–Geigy executive, testified at trial that Care and Kendallwood paid Ciba–Geigy a total of $209,569 for pharmaceuticals purchased at institutional prices; Griffin also testified that the normal wholesale price for the drugs would have been $720,845. The trial court did not commit plain error in holding that the amount of the loss to Ciba–Geigy was the difference between these two amounts, that is, the additional amount that Ciba–Geigy would have received if the drugs had been sold at wholesale prices. *See* U.S.S.G. § 2F1.1, comment. (n. 7) (stating that valuation of loss is discussed in the commentary to § 2B1.1); *id.* § 2B1.1, comment. (n. 2) (" 'Loss' means the value of the property taken, damaged, or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue.").

## VII.

We have reviewed carefully the remaining arguments advanced by defendants and conclude that they are without merit. The judgment of the District Court is affirmed.

BRIGHT, Senior Circuit Judge, concurring in part and dissenting in part.

I respectfully dissent from the majority's affirmance of Civella's conviction on the charges of wire fraud, transportation of stolen goods, etc., and conspiracy to commit the substantive offenses of mail fraud, wire fraud, and transportation of stolen goods, etc. There simply does not exist sufficient evidence from which a reasonable jury could base the verdicts.

This fraud case presents an unusual scenario. Here, a diversion operation existed whereby prescription medications were purchased from drug companies at minimal prices, designated by the drug companies' "own use" clauses for distribution to institutional settings only, and diverted by defendants for resale at a profit. This action by the defendants violated the "own use" clauses, constituting a breach of each of the individual contracts. The evidence pertaining to Civella's involvement in the venture does not, however, demonstrate the requisite intent to defraud as required to sustain a conviction under each of the statutes. As conceded by the majority, "the evidence is less clear regarding Civella's intent." Maj. op. at 665.

A challenge to the sufficiency of the evidence requires that we view the evidence in the light most favorable to the Government. The verdict will be sustained if supported by substantial evidence. *United States v. Widgery,* 636 F.2d 200, 202 (8th Cir.1980).

To sustain a conviction of wire fraud, in violation of 18 U.S.C. § 1343, the government must prove (1) the existence of scheme to defraud, and (2) use of the wires for the purpose of executing the scheme. Defendant's intent to defraud is an essential element that must be established. *United States v. Earles,* 955 F.2d 1175, 1179 (8th Cir.1992). The telephone conversations surreptitiously recorded in this case, rather than demonstrating Civella's fraudulent intent, merely evinced his participation in the management of the pharmacies.

A conviction under 18 U.S.C. § 2314, transportation of stolen goods, etc., requires inter alia proof of " 'knowledge on the part of the defendant that the property was taken by fraud.' " *Earles,* 955 F.2d at 1178 (quoting *United States v. Miller,* 725 F.2d 462, 468 (8th Cir.1984)). Proof that defendant was aware of the "own use" clauses alone cannot support a conviction under § 2314.

The essence of conspiracy necessitates an agreement to commit an offense or to defraud, attended by an act of one or more of the conspirators to effect the object of the conspiracy. *United States v. Andrade,* 788 F.2d 521, 525 (8th Cir.), *cert. denied,* 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986). Where the substantive offense underlying the conspiracy requires specific knowledge, failure to establish that specific knowledge for the substantive offense precludes conviction on the conspiracy count. *United States*

*v. Tavoularis,* 515 F.2d 1070, 1074 (2d Cir. 1975). Such is the case here.

Evidence presented by the Government of Civella's "knowledge of the scheme and intent to defraud" includes the following: (1) Civella received profits from the diversion operation in an amount at least equivalent to what the other participants received; (2) the diversion profits were not directly paid to Civella, but made out in the name of his daughter, both sons, and granddaughter; (3) Civella allegedly was the number one person running the operation, based on a hearsay statement; and (4) Civella's knowledge of the "own use" restrictions. The Government also eluded to Civella's purported reputation as a crime figure in Kansas City.

The fact Civella financed the pharmacies and assisted in their operation is insufficient to establish an intent to defraud. Nor does Civella's knowledge of the "own use" clauses provide the requisite proof of intent. The Government did not present any evidence that Civella, coupled with knowledge of the clauses, understood that the diversion program violated each of the "own use" clauses or that he participated in their violation with the intent to defraud the drug companies. *Cf. United States v. West,* 549 F.2d 545, 550 (8th Cir.) (evidence held sufficient to establish defendant not only wilfully breached the contract but engaged in intentional deception intended to induce another to part with property and achieved desired ends to support convictions of mail fraud, wire fraud, interstate transportation of fraudulently obtained goods, and conspiracy), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1601, 51 L.Ed.2d 806 (1977).

Civella's conviction, in light of the insufficiency of the evidence presented, would seem the result of guilt by association or purported reputation, an impermissible basis for sustaining the jury's verdicts. The Government should have provided actual proof of Civella's intent to defraud, which it did not do in this case. I would reject the conviction as resting on an impermissible basis. The Government simply failed to prove guilt beyond a reasonable doubt.