UNITED STATES of America, Appellee,

v.

Larry Edward HIVELEY, Appellant.

UNITED STATES of America, Appellee,

v.

Ansil Ezra HENRY, Appellant.

Nos. 94–4094, 95–1171.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1995.

Decided Aug. 11, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 22, 1995.

E. Daniel O'Brien of Cedar Rapids, IA (argued), for Hiveley.

Thomas J. O'Flaherty of Cedar Rapids, IA (argued), for Henry.

Patrick J. Reinert, U.S. Atty's. Office, Cedar Rapids, IA (argued), for appellee.

Before BEAM, Circuit Judge; BRIGHT, Senior Circuit Judge; and MURPHY, Circuit Judge.

PER CURIAM.

## I. INTRODUCTION

A federal grand jury indicted Ansil Ezra Henry, Larry Edward Hiveley, and numerous other co-defendants for various drug trafficking crimes. A jury found both Henry and Hiveley guilty of conspiracy to distribute marijuana, in violation of 21 U.S.C. § 846. The district court [1] sentenced Henry to twenty-one years eight months and Hiveley to nineteen years six months of imprisonment.

On appeal, Henry argues that the district court erred by: (1) denying his motion to suppress evidence and request for hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); (2) denying his post-sentence motion for new trial; and (3) improperly instructing the jury. Hiveley does not appeal his conviction, but claims that the district court committed error in: (1) determining his base offense level; and (2) increasing his sentence two levels for possession of a firearm during the commission of his crime. For the reasons that follow, we affirm.

[1]. The Honorable Michael J. Melloy, Chief Judge, United States District Court for the Northern District of Iowa.

## II. BACKGROUND

On May 27, 1994, Ansil Ezra Henry, Larry Edward Hiveley, and numerous other co-defendants were indicted for various drug trafficking crimes, including conspiracy to distribute marijuana and cocaine. We limit our discussion of the facts to Henry's and Hiveley's participation in the conspiracy.

Hiveley and Henry participated in an organization which trafficked drugs from Arizona to Iowa. Hiveley operated a ranch near Phoenix, Arizona. Henry ran a network of storage and distribution facilities in central Iowa for the redistribution of controlled substances obtained from Hiveley. At trial, various members of the organization testified regarding numerous instances of transportation and delivery of controlled substances between Hiveley's ranch in Arizona and Henry's operation in Iowa which occurred between 1986 and 1993.

On September 2, 1993, authorities executed a search warrant at Hiveley's ranch and seized over 1,100 pounds of marijuana from a storage building located on the property. In addition, authorities seized a telephone book listing numerous co-defendants and records reflecting the shipment of marijuana. Hiveley's fingerprints were found on a marijuana package and the records seized. Also, numerous firearms were recovered from Hiveley's residence, including three loaded handguns in the master bedroom along with marijuana, cocaine, and over $3,000 of currency.

Prior to trial, Henry filed a motion to suppress evidence and requested a hearing to challenge the probable cause findings made by the magistrate judge pursuant to *Franks v. Delaware*. The district court denied Henry's motion. On August 1, 1994, a jury convicted Henry and Hiveley of conspiracy to distribute marijuana. The jury, however, did not find them guilty of conspiring to distribute cocaine.

At sentencing, pursuant to the sentencing guidelines, the district court determined Hiveley's base offense level to be thirty-two,

added a two-level increase to reflect his possession of a firearm, and added a four-level increase to reflect his role in the offense. Thus, the district court determined Hiveley's total offense level to be thirty-eight, resulting in a sentencing range of nineteen years six months to twenty-four years four months. The district court sentenced Hiveley to nineteen years six months of imprisonment, and a five-year term of supervised release.

The district court determined Henry's base offense level to be thirty-two. The district court increased Henry's base offense level to reflect his obstruction of justice and his role in the offense, resulting in a total offense level of thirty-eight and a sentencing range of twenty-one years eight months to twenty-seven years two months. The district court sentenced Henry to twenty-one years eight months of imprisonment, a five-year term of supervised release, and ordered him to pay a $5,000 fine.

After sentencing, Henry filed a motion for new trial which the district court denied. This appeal followed.

## III. DISCUSSION

### A. Ansil Ezra Henry
#### Motion to Suppress and Evidentiary Hearing

Henry filed a motion to suppress evidence seized from his residence claiming the affidavit used to obtain the search warrant contained five alleged errors. Henry requested an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The district court found that even if it were to "omit the challenged statements and add information which the defendant asserts was intentionally omitted, there would remain a strong probability that evidence of drug trafficking and the fruits of drug crimes would be found at the Henry residence." Dist.Ct.Opinion and Order dated June 29, 1994 at 2.

Henry argues that the agents wanted to search for drugs. He alleges that the agents falsified their affidavit because they knew that it was not at all probable that drugs would be found at Henry's residence. Henry claims that when the references to falsehoods

and reckless disregard for the truth are set aside, insufficient grounds remained upon which to base a finding of probable cause, and the district court erred by not granting an evidentiary hearing to test the *Franks* motion.

We review the district court's denial of Henry's motion to suppress and request for hearing under the abuse of discretion standard. *See United States v. Shurn*, 849 F.2d 1090, 1096 (8th Cir.1988). In order to obtain a hearing, a defendant must make a "substantial preliminary showing" of a false or reckless false statement or omission and must further show that the alleged false statement or omission was necessary to a finding of probable cause, and the "substantial preliminary showing" requirement needed to obtain a *Franks* hearing is not lightly met. *United States v. Wajda*, 810 F.2d 754, 759 (8th Cir.), *cert. denied*, 481 U.S. 1040, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987). Probable cause exists when the application for a search "presents sufficient facts to justify a prudent person in the belief that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Riedesel*, 987 F.2d 1383, 1390 (8th Cir.1993) (citations omitted).

After reviewing the record, we determine that the district court did not abuse its discretion in denying Henry's motion to suppress and request for a hearing. The district court appropriately on the record determined that even if the alleged false statements were omitted and the alleged intentionally omitted information were added, probable cause still existed to issue the search warrant. The search warrant indicated that there was probable cause to believe Henry had marijuana at his residence. At a pretrial hearing, the affiant stated an expectation not to find large quantities of marijuana. Although inaccuracies exist in the affidavit used to obtain the search warrant, probable cause still existed to believe there would be marijuana or other evidence of drug trafficking.

#### Jury Instruction

Next, Henry argues that the district court erred in instructing the jury because the

district court failed to delete particular language from jury instruction number 30. At trial, Henry objected to the wording of jury instruction number 30. Instruction number 30 informed the jury that it had heard evidence that witnesses had been paid for expenses related to providing information to the government and that they could consider the testimony and give it such weight as the jury thought the testimony deserved. The instruction further told the jury that whether the information or testimony provided by the witness was influenced by any payments was for the jury to determine.

The paragraph in instruction number 30 that Henry objected to states, in part, that "[y]ou have also heard evidence that witnesses had arrangements with the government under which they got paid for expenses related to providing information to the government." Henry requested that the words "expenses related to" be deleted from the instruction, leaving room to argue that the informant witnesses were paid for their information. Henry claims that he made this request because the government ignored or refused to respond to repeated requests for disclosure of information about payments made to witnesses, and that the government's *Brady* violations, coupled with the trial court's refusal to grant a simple remedy, should result in a reversal in this case. We, however, disagree.

■ We review a trial court's refusal to delete a phrase from a jury instruction for abuse of discretion. *United States v. Parker,* 32 F.3d 395, 400 (8th Cir.1994). A "district court has wide discretion in formulating appropriate jury instructions." *United States v. Walker,* 817 F.2d 461, 463 (8th Cir.), *cert. denied,* 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 134 (1987) (citations omitted). The court formulated instruction number 30 based upon Eighth Circuit Model Instruction 4.06. The district court modified its draft jury instructions to insert the phrase "expenses related to" to conform the jury instruction to the evidence produced at trial regarding payments made to Mervin White and Mike Hake. Both White and Hake testified they were paid for expenses related to providing information, and not purely for

providing information. The district court did not err because the jury instruction properly sets forth the applicable law and the evidence presented on this subject.

## Motion for New Trial

After sentencing, Henry filed a motion for new trial claiming that newly discovered evidence would have supported giving the jury an instruction on multiple conspiracies. Henry argues that the district court erred by denying the new trial motion based on the government's admission at sentencing that multiple conspiracies existed in this case. At sentencing, the district court asked the government to discuss the utilization of cocaine as part of the relevant conduct in sentencing Henry and Hiveley. In response, the government discussed a number of different ways the court could assess these defendants with a quantity of cocaine discussed at trial as part of their relevant conduct even though the jury did not return a unanimous verdict that cocaine was one of the substances involved in the conspiracy. Henry claims that the government's argument at sentencing is an admission by the government, which constitutes evidence of the existence of multiple conspiracies rather than one conspiracy. Therefore, Henry asserts that a new trial should be conducted so that a multiple conspiracy instruction could be presented to the jury.

■ A district court's denial of a new trial motion is reviewed for abuse of discretion. *United States v. Costanzo,* 4 F.3d 658, 667 (8th Cir.1993). Under Rule 33 of the Federal Rules of Criminal Procedure, a court may grant a new trial to a defendant if required in the interest of justice. "To obtain a new trial on the basis of newly discovered evidence, a defendant must show, among other things, that the evidence is in fact newly discovered, *i.e.,* discovered since the trial; and that the newly discovered evidence is of such a nature that, on a new trial, it probably would produce an acquittal." *United States v. Richards,* 967 F.2d 1189, 1197 (8th Cir. 1992) (citations omitted). No abuse of discretion appears here in denying Henry's motion for a new trial. The evidence to which reference was made by Henry does not con-

stitute evidence "newly discovered," and Henry did not demonstrate that the outcome of a new trial would probably result in an acquittal.

## B. Larry Edward Hiveley
### Drug Quantity

■ Hiveley· alleges the district court erred in making its findings of fact regarding the drug quantity attributable to him for his conduct in participating in this conspiracy. Hiveley contends that the district court erred in making factual findings assessing him with various quantities of controlled substances based upon the testimony of co-conspirators, corroborating evidence, and quantities of drugs seized. Because of claimed insufficient evidence to support some of the quantity determinations made by the district court, Hiveley argues that the case should be remanded for re-sentencing.

At sentencing, the court found that Hiveley's relevant conduct included 1,695 kilograms of marijuana. Most of the quantity determinations required the district judge to rely on estimates of co-conspirators, Tom Burns, Tom Lowe and Butch White. Their estimates and guesses accounted for 1,195 kilograms of marijuana. The remainder of the total quantity was based on 1,100 pounds of marijuana seized from a trailer on Hiveley's property. The thrust of Hiveley's argument is that the co-conspirators' testimony regarding the quantity of drugs is not credible because their testimony was rejected by the jury at trial.

At sentencing, the determination of drug quantity is a factual finding and is reviewed under the clearly erroneous standard. *United ed States v. Sleet*, 893 F.2d 947, 949 (8th Cir.1990). The district court's finding regarding the quantity of drugs is not clearly erroneous, and the court did not err in calculating the relevant drug quantity attributable to Hiveley for sentencing purposes. After reviewing the record, we determine that the district court's quantity determinations were based upon its review of the evidence and credibility of the witnesses. Although the

court noted that some of the witnesses exhibited credibility problems, the court went on to make specific findings concerning each witness' testimony and the quantity attributed to determine the base offense level. The court considered all of the evidence presented, including credibility, and approximated a quantity of drugs attributable to Hiveley.[2]

### Increase for Possession of a Firearm

■ The district court enhanced Hiveley's sentence two levels for possession of a firearm during the commission of a crime pursuant to U.S.S.G. Section 2D1.1(b)(1). Application Note 3 provides:

> The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.

U.S.S.G. § 2D1.1(b)(1), comment. (n. 3).

Hiveley argues that the district court erred in increasing his sentence by two-levels to reflect his possession of a firearm during the commission of the conspiracy. Hiveley contends that the government failed to show that it was not clearly improbable that the weapons seized from his residence had a nexus with the criminal activity.

The guns seized by the government in this case were seized from the bedroom of a 1971 double-wide mobile home where Hiveley, his wife and her two minor children lived. There were a number of unloaded long-arm rifles and shotguns found in the closet off the master bedroom. Small handguns were located in the master bedroom. Kim Hiveley testified that the two loaded small caliber pistols belong to her, and that she obtained those prior to getting married to Larry Hiveley in 1993. There were no weapons seized from the trailer where the 1100 pounds of

---

**2.** To sentence an offender by the weight of drugs attributed to that person by a co-conspirator now cooperating with the government usually for a reduced sentence, is a procedure that can be subject to much error and can justifiably be criticized. *See* Addendum, *infra.*

marijuana were found. Hiveley contends that because there was no evidence that he had ever used any weapon in connection with drug trafficking, the district court committed clear error by assessing the two-level enhancement against him for the weapons. This argument does not mandate a reversal.

The district court could properly enhance Hiveley's sentence for possession of a firearm; evidence in the record supports the finding of the district judge. Moreover, proof of a connection between the firearms and the criminal activity "does not require a showing that [defendant] 'ever used or even touched the (gun).' ... Constructive possession will suffice to justify an upward adjustment for possession of a firearm during the commission of an offense." *United States v. Turpin,* 920 F.2d 1377, 1386 (8th Cir.1990), *cert. denied,* 499 U.S. 953, 111 S.Ct. 1428, 113 L.Ed.2d 480 (1991), *citing United States v. Luster,* 896 F.2d 1122, 1129 (8th Cir.1990).

During the search of Hiveley's ranch, officers recovered over 1,100 pounds of marijuana in a storage building located on the ranch. Also recovered in the search of the shed were drug records, scales, packaging materials, and a device to compress marijuana. The drug records seized from the shed contained twenty-four separate accounts designations reflecting a total shipment of 10,262 pounds of marijuana. During the search of the master bedroom, officers found marijuana, cocaine, over $3,000 cash, three loaded handguns, a .44 magnum revolver and two .25 caliber semiautomatic pistols, and a drug scale. Overall, the evidence supports the district court's enhancement of Hiveley's sentence of two levels for possession of a firearm during the commission of a crime.

## IV. CONCLUSION

Accordingly, we affirm Henry's conviction and the sentence of twenty-one years eight months of imprisonment. In addition, we affirm Hiveley's sentence of nineteen years six months of imprisonment.

BRIGHT, Senior Circuit Judge, concurring.

I concur but add my separate views concerning the sentence imposed on Hiveley as well as comment on the sentence imposed on his codefendant Henry. This case is the paradigm of what judges often see in the sentencing of drug law offenders. In this case, the sentences are excessively long, but required by the mandatory minimum sentencing provisions and the overlaying requirements of the federal sentencing guidelines.

These unwise sentencing policies which put men and women in prison for years, not only ruin lives of prisoners and often their family members, but also drain the American taxpayers of funds which can be measured in billions of dollars. In these times, the government, Congress and the President see the need to make drastic cuts in the federal budget, including budget cuts which already affect the poor, the disadvantaged and the elderly. This is the time to call a halt to the unnecessary and expensive cost of putting people in prison for a long time based on the mistaken notion that such an effort will win "The War on Drugs." If it is a war, society seems not to be winning, but losing. We must turn to other methods of deterring drug distribution and use. Long sentences do not work and, as I demonstrate below, penalize society.

Let's look at the present case. Ansil Ezra Henry is forty-four years of age and has had no prior serious criminal convictions; only three prior misdemeanor-type crimes which called for small fines or probation. Henry cannot read or write. Henry was such a "dangerous" offender that pending trial Magistrate Judge John A. Jarvey, a fine jurist, released Henry on his own recognizance. Without question, Henry deserves prison. But, I doubt that any reasonable judge would sentence him to more than twenty-one years in prison as was required by the applicable guidelines. Essentially, the way the guidelines operate in practice, non-judicial persons in reality send people to jail. The usually zealous prosecutor determines how to charge the offender, and the probation officer calculates the numbers for the judge, *i.e.,* for Henry a total offense level score (38) and criminal history points (3). The judge then sentenced this offender by the numbers, which measured not necessarily his culpabili-

ty but the weight of the drugs attributable to the conspiracy of which the defendant was a member. In this case, the weight was heavy.

Henry will reach nearly sixty-five years of age as a federal prisoner if he survives his prison term. He will probably leave prison as a geriatric patient at a likely further cost to society. Moreover, the cost of his care in prison will likely increase over that of other more youthful prisoners, as Henry spends his older years behind bars.

Let's look at Hiveley, the second defendant. He had grown up on an Iowa farm. He is forty-eight years of age and apparently operated a ranch near Phoenix, Arizona where drugs were stored and distributions made. Although Hiveley had some brushes with the law, particularly in his juvenile years, he has zero criminal history points. Here too in pretrial Magistrate Judge Michael Mignilla released this "dangerous" criminal on his own recognizance. The district court sentenced Hiveley to nineteen and one-half years in prison. When released he will be an aged person. I doubt that any reasonable judge would have sentenced these offenders to more than ten years incarceration and most probably to less, given their limited criminal history.

What does the excess time in jail mean to the taxpayers? In today's economy it costs about $22,000 per year to put a federal offender in a federal prison (about the same cost as a year at a private college).[3]

If each of these defendants serve ten years longer than necessary, taxpayers pick up a bill for twenty years (both offenders) at about $440,000. But that is only an infinitesimal portion of the financial burden imposed by excessive sentences often required by

mandatory minimum sentences and the concomitant guidelines.

The United States Department of Justice on February 4, 1994 released an analysis of drug offenders only with minimal criminal histories, entitled *An Analysis of Non–Violent Drug Offenders with Minimal Criminal Histories.* The analysis disclosed that 16,316 federal prisoners could be deemed low-level drug violators.[4] That figure is 36.1% of all drug offenders. The average sentence of low-level offenders was 6.8 years, meaning that these individuals will actually serve an average of five and three-quarters years.

Moreover the study also revealed:

1. The majority of low-level offenders had no prior recorded contact with the criminal justice system.

2. Two-thirds of the low-level drug offenders in the federal prison have received mandatory minimum sentences.

3. Among the low-level offenders, 42.3% were couriers or played peripheral roles in drug trafficking.

4. Low-level drug sentences have increased 150% above what they were prior to sentencing guidelines and mandatory minimum sentences.

*Id.* at 3.

In this writer's opinion based on hearing many drug cases on appeal over twenty-seven years, it is doubtful that heavy sentences for low-level drug offenders have aided the war on drugs. It has only increased the cost to the public. What is that cost? Based, again on average cost of housing prisoners in fiscal 1995 at about $22,000 a year, an extra year's incarceration of the low-level

---

3. In Fiscal 1994, it cost an average of $58.50 per day to house an inmate in a federal institution. The average annual amount was $21,352. The cost varies depending upon the security level of the institution in which an inmate is confined, as well as the geographic location of the facility. The figure of $58.50 is the system-wide average cost. In Fiscal 1995, we estimate the average cost per day per inmate will be $60.26, with an average annual amount of $21,995. Letter from Kathleen M. Hawk, Director, United States Department of Justice, Federal Bureau of Prisons to the Honorable Myron H. Bright (July 6, 1995) (on file with Judge Bright).

4. The study by the Department of Justice defined low-level drug offenders as follows:

In this study, we have examined information on low-level drug law violators. *By low-level drug law violators, we mean, essentially, non-violent, offenders with minimal or no prior criminal history whose offense did not involve sophisticated criminal activity and who otherwise did not present negative characteristics which would preclude consideration for sentence modification.*

U.S. Dep't of Justice, *An Analysis of Non–Violent Drug Offenders with Minimal Criminal Histories,* p. 6 (1994) (footnote omitted).

offenders (16,316) is $358,952,006 (almost $359 million).

If these same low-level drug offenders serve an extra five years of imprisonment over what is a proper, non-guideline, sentence, the cost to the taxpayers exceeds one and three-quarters billion dollars ($1,794,-760,000.00). And still that is only part of the story.

The Federal Judicial Center in 1994 did a study on the effect of mandatory minimums and current guideline sentencing. I quote from this study:

> We know from previous work by the Bureau of Prisons that 70% of the prison growth related to sentencing since 1985 is attributed to increases in drug sentence length. "(D)rug law offenders alone are consuming three times more resources than all other federal crimes combined ... unless Congress and the Sentencing Commission change drug sentences, relief will be nowhere in sight. The prison population could reach 110,000 by 1997, two-and-a-half times what it was in 1987, at a yearly operating cost of well over $2 billion." The average annual cost of incarceration is $20,747 per prisoner. Construction of new prison space is, of course, an additional expense.

Federal Judicial Center, *The Consequences of Mandatory Minimum Prison Terms: A Summary of Recent Findings,* p. 9 (1994).

As noted, the increases in drug sentencing length require more prisons. Twelve new federal prisons are now under construction and will increase federal prison beds by 19,-575. Their cost is over one billion dollars— to be exact, $1,188,000,000. (Hawk letter, July 6, 1995, p. 2).

Again, this is only part of the story. As an appellate judge, I have seen draconian sentences meeted out in drug cases where an offender has had no contact with any drugs but may be only a minor functionary in a drug conspiracy where heavy amounts of drugs could be involved. *See United States v. Montanye,* 962 F.2d 1332 (8th Cir.1992),

*reh'g in part,* 996 F.2d 190 (8th Cir.1993) (where the offender provided glassware useable to manufacture amphetamines and received a sentence of thirty years in the federal penitentiary).

Federal judges who sentence offenders know the problem. 86.4% of district judges support changing the current sentencing rules to increase the discretion of the judge; 70.4% support repealing most of all mandatory minimum sentencing and 82.8% of all district judges feel that federal judges would be appropriate decision makers about the nature and severity of sanctions to be imposed in criminal cases. More than half would eliminate sentencing guidelines. Federal Judicial Center, *Planning for the Future: Results of a 1992 Federal Judicial Center Survey of United States Judges* (1994).

These are not "soft headed judges." They serve on the front lines of the criminal justice system and know of what they speak. They represent appointees of every president from Eisenhower to Clinton. But the law makers and law enforcers, Congress and the administration, seem to turn a deaf ear to the problem and to the unnecessary, immense cost to the taxpayer of unnecessary lengthy incarceration of drug offenders.

I think it can be said that judges are vitally concerned with the drug problem in America. Reason, not emotion, must be brought to bear on the subject. What are judges to do about these unreasonable sentencing rules which we must apply? I suggest that we must try to make our views known loudly and clearly.

As for this writer, I intend to cite to this opinion and its addendum in every drug case where I believe the present system requires the sentencing judge to impose an unreasonable sentence. I would urge my fellow judges, similarly, to speak out and to write opinions on this subject. The public needs to know that unnecessary, harsh and unreasonable drug sentences serve to waste billions of dollars without doing much good for society. We have an unreasonable system.[5]

---

**5.** I have written other commentaries on the guidelines. *See, e.g., United States v. Griffin,* 17 F.3d 269, 273 (8th Cir.1994) (Bright, J., dissent-

ing) (addressing the myth of consistency in sentences under the Guidelines and commenting on the obvious unfairness of mandatory minimum

The message judges, district and circuit, can send Congress and the President is this: If you want to save billions for the country without harming anyone, take a look at and change the rules of sentencing now in the federal courts. If we speak with a united voice perhaps they, and the public, will listen.

sentences); *United States v. Goebel,* 898 F.2d 675, 679 (8th Cir.1990) (Bright, J., concurring) (observing that the Sentencing Guidelines produce disparate and unfair sentencing results among similar offenders); *United States v. O'Meara,* 895 F.2d 1216, 1221 (8th Cir.) (Bright, J., dissenting), *cert. denied,* 498 U.S. 943, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990) ("This case opens the window on the sometimes bizarre and topsy-turvy world of sentencing under the Guidelines.").