# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-1344

_____

| | |
|---|---|
| Andrew Jones, | * |
| | * |
| Appellant, | * |
| | * |
| v. | * |
| | * |
| United States of America, | * |
| | * |
| Appellee. | * |

_____

No. 97-2235

_____

Appeals from the United States
District Court for the
Eastern District of Missouri.

| | |
|---|---|
| Felton J. Sykes, | * |
| | * |
| Appellant, | * |
| | * |
| v. | * |
| | * |
| United States of America, | * |
| | * |
| Appellee. | * |

_____

Submitted: January 12, 1998
Filed: May 27, 1998

_____

Before BOWMAN, Chief Judge, BRIGHT, Circuit Judge, and JONES[1], District Judge.
_____

JONES, District Judge.

Andrew Jones ("Jones") was convicted by a jury of conspiracy to distribute and possess with intent to distribute heroin and cocaine in violation of 21 U.S.C. § 846, and with distribution of heroin in violation of 21 U.S.C. § 841(a)(1). Felton Sykes ("Sykes") was charged in the conspiracy count and entered a plea of guilty thereto. Jones was the only one of twenty-one alleged conspirators to proceed to trial. The District Court[2] sentenced Jones to 360 months' imprisonment and sentenced Sykes to 84 months' imprisonment. Jones appeals his conviction and the sentence he received. Sykes appeals his sentence. We affirm.

## I. BACKGROUND

The defendants were involved in a conspiracy to distribute heroin and cocaine in the St. Louis, Missouri area. The two ringleaders of the conspiracy were Lamond Sykes (a cousin of defendant Sykes) and Eluterio Reyes ("Reyes"). Lamond Sykes led the conspiracy in its distribution of drugs in St. Louis. Reyes, of Phoenix, Arizona, was the main supplier of drugs to the conspiracy. Various members of the conspiracy transported drugs and money between Phoenix, Arizona and St. Louis, Missouri. Other members prepared the heroin for retail sale and distributed the heroin to primary distributors and ultimate consumers. All twenty-one members of the conspiracy, except Jones, plead guilty and were sentenced to various terms of imprisonment ranging from

[1]The Honorable John B. Jones, United States District Judge, United States District Court for the District of South Dakota, sitting by designation.

[2]The Honorable Catherine Perry, United States District Judge, United States District Court for the Eastern District of Missouri.

-2-

18 months to 276 months. The ringleaders, Lamond Sykes and Reyes, were each sentenced to 276 months' imprisonment.

## A.     Felton Sykes

Sykes was charged with participating in the conspiracy from September of 1991 to June of 1994. Sykes was held responsible for distributing approximately 28 kilograms of heroin and 595.35 grams of cocaine. Sykes assisted in the preparation of heroin for retail sale, stored heroin, packaging materials, and money from the sale of heroin at his residence, and met with Lamond Sykes, one of the ringleaders of the conspiracy, to obtain heroin and make payment for heroin previously supplied to Sykes. Sykes was ranked sixth to eighth in culpability amongst the twenty-one defendants charged in the conspiracy. Sykes claims his involvement in the conspiracy ended when he was incarcerated on state drug convictions from October of 1992 to February of 1993. However, a federal search warrant executed in June of 1994 at Sykes' business and residence resulted in the seizure of over 300 grams of heroin. Sykes does not attempt to explain the existence of this heroin, which was seized over a year after Sykes asserts he ceased participation in the conspiracy.

The guideline range for Sykes was 135 to 168 months' imprisonment. The District Court granted the government's motion for a downward departure, under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e), based on Sykes' substantial assistance in the investigation and prosecution of other persons who were involved in the conspiracy. Sykes was sentenced to a term of imprisonment of 84 months, a term of supervised release of 3 years, and was ordered to pay a special assessment of $50.

Sykes claims the District Court erred in denying him a minor participant reduction under U.S.S.G. § 3B1.2(b) and the District Court erred in failing to depart sufficiently to cure the disparity in sentences received by Sykes and other, more culpable, codefendants. The government argues that Sykes did not preserve for review

the issue of the minor participant reduction and that the disparity in sentences argument has no merit.

**B.   Andrew Jones**

Jones was charged with participating in the conspiracy from the winter of 1986 to December 22, 1994.  Jones was held responsible for distributing approximately 71.5 kilograms of heroin and approximately 595.35 grams of cocaine.  The District Court imposed a sentence of 360 months' imprisonment on the conspiracy count and 240 months' imprisonment on the distribution count, to be served concurrently; 5 years of supervised release on the conspiracy count and 3 years of supervised release on the distribution count, to run concurrently; and a special assessment of $100.

Jones was a street level seller, selling "buttons" of heroin to addicts in the St. Louis area.  Terry Martin testified at Jones' trial that he and Jones, among others, began selling buttons from houses and then sold from vehicles when law enforcement started busting houses where drugs were being sold.  Jones was also present on occasions when heroin was being prepared and packaged for retail sale.

Jones sought a downward departure on the basis of reduced mental capacity. During the sentencing hearing, Jones called Dr. Daniel J. Cuneo, a clinical psychologist, to establish that Jones was entitled to such a departure.  Dr. Cuneo opined that Jones suffered schizo-effective disorder, depressed type, and that he was mildly mentally retarded.  He opined that Jones functioned at the level of an eight- or nine-year-old person.  Dr. Cuneo determined that Jones had an IQ of 53.

The government called Dr. John Rabun, a forensic psychiatrist, to dispute Jones' claim that he suffered from reduced mental capacity which would entitle him to a downward departure.  Dr. Rabun testified that Jones' alleged conduct of engaging in business activities, including setting up drug buys at specific locations, answering

hundreds of pages on his beeper per day and handling large sums of money, are inconsistent with mental retardation. Dr. Rabun also stated that Jones' conduct in conforming to the conditions of his release on bond and his knowledge of such conditions are inconsistent with mental retardation. Dr. Rabun testified that although Jones has a mental condition, that mental condition did not cause or contribute to his criminal activity.

The District Court denied Jones' motion for downward departure based on reduced mental capacity. After considering the evidence presented by Dr. Cuneo and Dr. Rabun and the arguments of counsel, the District Court did not find that Jones' mental capacity was significantly reduced or that it contributed to the commission of the offense.

Jones raises four issues in this appeal: (1) the District Court erred in admitting guilty pleas of non-testifying codefendants; (2) the District Court abused its discretion in admitting evidence regarding Jones' uncharged, subsequent drug transactions; (3) the District Court's finding that Jones did not have reduced mental capacity led it to mistakenly believe it did not have authority to depart for Jones' mental illness and retardation, therefore, the District Court erred when it refused to depart; and (4) the District Court erred in holding that it could not depart on the basis of the disparate sentences received by others more culpable than Jones.

## II. DECISION

### A. Felton Sykes

Where a defendant fails to object to the presentence report, we review for "'plain error resulting in a miscarriage of justice.'" United States v. Flores, 959 F.2d 83, 88 (8th Cir.) (citation omitted), cert. denied, 506 U.S. 976 (1992). Sykes asserts that although his attorney failed to raise an objection to the presentence report prior to his

first sentencing hearing, Sykes personally raised the issue of his limited participation in a resentencing hearing. We disagree. In his statement to the District Court during the resentencing hearing, Sykes stated that he should not be held responsible for the full amount of the heroin distributed during the conspiracy because he was not involved for the entire time the conspiracy was active. Neither Sykes nor his attorney requested a reduction under U.S.S.G. § 3B1.2(b) for being a minor participant. Therefore, we review for plain error resulting in a miscarriage of justice. Flores, 959 F.2d at 88.

Sykes carries the burden of proving he is eligible for a decrease in the base offense level on the minor nature of his participation in the offense of conviction. United States v. Wilson, 102 F.3d 968, 973 (8th Cir. 1996). We have explained that "[a] defendant who is concededly less culpable than his codefendants is not entitled to the minor participant reduction if that defendant was 'deeply involved' in the criminal acts." United States v. Thompson, 60 F.3d 514, 518 (8th Cir. 1995) (quoting United States v. West, 942 F.2d 528, 531 (8th Cir. 1991)). Sykes did not object to the conclusion in the presentence report that he was ranked sixth to eighth in culpability amongst the twenty-one codefendants. He did not dispute that he helped prepare heroin for retail sale, that he stored heroin, packaging materials and money at his residence, or that he met with his cousin, Lamond Sykes, for the purpose of obtaining heroin and making payment for heroin previously supplied to Sykes. The District Court found that Sykes' involvement in the conspiracy was "substantial." It is clear from the record in this case that Sykes was "deeply involved" in the criminal acts of the drug conspiracy. We do not find plain error resulting in a miscarriage of justice in failing to grant Sykes a reduction in the base offense level for being a minor participant in the drug conspiracy.

Sykes' second argument in this appeal is that the District Court erred in failing to depart sufficiently to cure the disparity in sentences received by Sykes and other more culpable codefendants. Jones' disparity in sentences argument is foreclosed by this Court holding that "[d]isparity between sentences imposed on codefendants is not

a proper basis for departure." <u>United States v. Polanco</u>, 53 F.3d 893, 897 (8th Cir. 1995), <u>cert. denied</u>, 518 U.S.1021 (1996); and <u>United States v. Wong</u>, 127 F.3d 725, 728 (8th Cir. 1997). "A defendant cannot rely upon his co-defendant's sentence as a yardstick for his own; a sentence is not disproportionate just because it exceeds a co-defendant's sentence." <u>United States v. Granados</u>, 962 F.2d 767, 774 (8th Cir. 1992). Although Congress enacted the Sentencing Guidelines to promote proportional and uniform sentences for the same criminal activity, "some disparity will inevitably exist because of the unique facts of each individual defendant's case." <u>Wong</u>, 127 F.3d at 728.

**B.     Andrew Jones**

Jones' first claim is that the District Court erred in admitting guilty pleas of non-testifying codefendants. During cross-examination by Jones' counsel regarding transcripts of taped conversations, the government's case agent stated, "... the rest of the defendants having plead guilty, we did not use [a summary book of transcripts]."

The trial court has broad discretion to admit evidence and we will reverse only if the trial court abused its discretion. <u>United States v. Rogers</u>, 939 F.2d 591, 594 (8th Cir.), <u>cert. denied</u>, 502 U.S. 991 (1991). If a guilty plea of a codefendant is brought into a trial, either directly or indirectly, "trial courts must ensure it is *not* being offered as substantive proof of the defendant's guilt." <u>Id.</u> The defendant's right to a fair trial may be seriously prejudiced if such pleas are mentioned at trial. <u>Id.</u> The facts and circumstances of how a plea was used at trial must be carefully scrutinized by the appellate court. <u>Id.</u> "It is essential to consider such factors as whether the court gave the jury a limiting instruction, 'whether there was a proper purpose in introducing the fact of the guilty plea, whether the plea was improperly emphasized or used as substantive evidence of guilt, and whether the introduction of the plea was invited by the defense counsel.'" <u>Id.</u>

The testimony Jones complains of was not elicited by the government and the government did not improperly emphasize it or use it as substantive evidence of Jones' guilt. It appears that this testimony was volunteered by the case agent. Defense counsel did not necessarily invite the case agent's reference to the guilty pleas, but the reference was made while defense counsel was cross-examining the case agent. Jones did not request, and the District Court did not give, a limiting instruction regarding the case agent's testimony. Given the limited reference to the guilty pleas, and the government's choice not to emphasize the guilty pleas to the jury, we find that Jones' counsel made a tactical decision not to request a limiting instruction. Under the circumstances presented by this case, we do not find plain error in the District Court's failure to give a cautionary instruction. Id.

The second argument advanced by Jones is that the District Court abused its discretion in admitting evidence of Jones' uncharged, subsequent drug transactions. The evidence which Jones objects to is the testimony of the government's case agent. When defense counsel asked if Lamond Sykes was still supplying Jones with drugs after May of 1994, the case agent responded, "Not necessarily, no. I'm saying that [Jones] was still selling drugs." The case agent made additional statements that Jones was selling drugs between May of 1994 and December of 1994.

Fed.R.Evid. 404(b) is a rule of inclusion: "we will overturn the admission of Rule 404(b) evidence only if 'the appellant can show that the evidence in question clearly had no bearing upon any of the issues involved.'" United States v. Baker, 82 F.3d 273, 276 (8th Cir.), cert. denied, ___ U.S. ___, 117 S.Ct. 538 (1996). Jones has failed to make such a showing in this case. We have held that "[e]vidence of similar drug activity is admissible in a drug prosecution case because 'a defendant's complicity in other similar transactions serves to establish intent or motive to commit the crime charged.'" United States v. Johnson, 934 F.2d 936, 940 (8th Cir. 1991) (citation omitted). Although the evidence at issue in this case relates to Jones' drug selling activities after he left the conspiracy charged in the indictment, the mere subsequency

of such acts do not, solely on those grounds, make the evidence incompetent to establish intent or motive. Id. The evidence at issue here indicates that Jones continued to sell drugs after he left the conspiracy led by Lamond Sykes. This evidence is similar in kind and close in time to the drug activity Jones engaged in while a member of the conspiracy charged in the indictment.

The Rule 404(b) evidence Jones objects to was elicited by Jones' attorney during cross-examination of the government's case agent. Testimony elicited by defense counsel on cross-examination regarding Rule 404(b) evidence is admissible. United States v. Kragness, 830 F.2d 842, 866, n. 23 (8th Cir. 1987). The District Court did not abuse its discretion in admitting the evidence of Jones' uncharged, subsequent drug activities.

Jones' third argument is that the District Court erred in refusing to downwardly depart because the court's finding that Jones did not have reduced mental capacity led it to mistakenly believe it did not have authority to depart for Jones' mental illness and retardation. The government asserts that although the District Court did not decide to depart based on reduced mental capacity, the District Court did recognize its *authority* to depart downward for diminished capacity. We agree with the government. The District Court clearly stated during the sentencing hearing that although it had the ability under the guidelines to depart where a defendant's significantly reduced mental capacity contributed to the commission of the offense, the court refused to so depart in this case. This refusal to depart was based on the District Court's finding that Jones's mental capacity was not significantly reduced, or even if it was lower than normal, it did not contribute to the commission of the offense in this case.

We lack authority to review a sentencing court's exercise of its discretion to refrain from departing either upward or downward from the range established by the applicable Sentencing Guideline. United States v. Evidente, 894 F.2d 1000, 1004-05 (8th Cir.) cert. denied, 495 U.S. 922 (1990); and United States v. Follett, 905 F.2d 195,

197 (8th Cir. 1990) (holding that the district court's refusal to depart downward on the basis of the defendant's psychological problems and diminished capacity was not reviewable on appeal), cert. denied, 501 U.S. 1204 (1991). "Failure to depart downward is reviewable only if the district court did not realize that it had the discretion to consider a downward departure." United States v. Knight, 58 F.3d 393, 398 (8th Cir. 1995) (citation omitted), cert. denied, 516 U.S. 1099 (1996). The District Court clearly recognized its authority to depart in this case, and, therefore, the court's decision refusing Jones' request for a downward departure based on diminished mental capacity is unreviewable on this appeal.

Jones' final argument is that the District Court erred in holding that it could not depart on the basis of the disparate sentences received by others more culpable than Jones. Jones' sentence guideline computation was based on an offense level of 40 and a criminal history category of III, resulting in a sentence range of 360 months to life.

If Jones had pled guilty and received a 3-level reduction for acceptance of responsibility under Section 3E1.1(a)(b)(1)(2), his sentence range would have been 262 months to 327 months. By going to trial, Jones raised his minimum sentence under the guidelines by 98 months. The two ringleaders of this conspiracy, who pled guilty but did not otherwise provide any assistance to the government, each received sentences of 276 months, probably as a result of a 3-level reduction for acceptance of responsibility.

Jones joined the conspiracy near its beginning, and there was evidence that Lamond Sykes had stated that Jones was his most loyal and steady worker. The presentence reports attributed the same drug amounts to Lamond Sykes and Jones on the conspiracy charges.

As stated above in connection with Sykes' disparate sentences argument, Jones' argument is precluded by our prior holding that disparity in sentences among

codefendants is not a proper basis for a departure.  See Wong, 127 F.3d at 728; and United States v. Reeves, 83 F.3d 203, 207 (8th Cir. 1996) (holding a defendant's argument that his sentence is disproportionate to his codefendants, considering his comparably minor role in the offense, was precluded by prior Eighth Circuit decisions).

Although Jones' sentence is significantly heavier than other more culpable members of the drug conspiracy, this Court's review of Jones' sentence imposed under the Sentencing Guidelines is limited to determining whether it "was imposed as a result of an incorrect application of the sentencing guidelines."  18 U.S.C. § 3742(a)(2); see also, Granados, 962 F.2d at 774.  We find that the District Court correctly applied the Sentencing Guidelines in Jones' case.
.

## III.  CONCLUSION

The judgment of the District Court in both cases is affirmed.

**BRIGHT, Circuit Judge, concurring in part and dissenting in part.**

I concur in the result reached by this court with respect to the appeal of Felton Sykes.  I must dissent, however, in this court's affirmance of Andrew Jones' sentence.

## I.     An Unfair Criminal System

The sentence of Jones, a man with the mind of a child, to thirty years of incarceration makes a mockery out of the phrase, "Equal Justice Under the Law."  In this case, the lowest person on the totem pole, a mere street-level seller with an I.Q. of fifty-three received a heavier sentence than the mastermind of the conspiracy and the conspiracy's primary drug supplier.  What kind of system could produce such a result? This case provides yet another example of how rigid sentencing guidelines and the

mandatory minimums associated with drug cases make an unfair "criminal"[3] system. Moreover, even under the Sentencing Guidelines, the district court should have determined that Jones' limited mental capacity probably prevented him from comprehending the conspiracy's activities other than those sales that he personally made.

Jones' thirty-year sentence represents the heaviest sentence given to any member of this twenty-one person drug conspiracy. Lamond Sykes, the kingpin of the conspiracy, and Eluterio Reyes, the primary drug supplier, each received a sentence of twenty-three years. Roberta Farr, who served as an alternative source for heroin, received only two years' incarceration. The prosecutor in this case concedes that Jones served only as a street-level seller and that Jones received a harsh sentence. The prosecutor states that had Jones pleaded guilty, he would have received a lesser sentence, and that Jones' insistence on exercising his Constitutional right to a trial justified his heavy sentence. In turn, Jones' defense counsel asserted that he told Jones that counsel would accept a plea agreement but believes that because of Jones' reduced mental capacity that Jones may not have understood the need to accept the plea agreement.[4]

The criticism for this heavy sentence imposed on the least responsible person in the conspiracy is not directed at the district court or the attorneys. The injustice in this case rests with our faulty system of sentencing guidelines and mandatory minimums. I add this case to my litany of opinions criticizing the guidelines. See, e.g., Montanye v. United States, 77 F.3d 226, 233 (8th Cir.) (Bright, J., dissenting) ("By any ordinary measure outside the guidelines, I would think this sentence would be considered

---

[3]I use the term criminal system rather than criminal justice system because the present scheme of sentencing guidelines and mandatory minimums often produces an unfair or inequitable result.

[4]These comments were in response to questions from the court at oral argument.

draconian, unnecessarily harsh and unreasonable."), cert. denied, 117 S. Ct. 318 (1996); United States v. Hiveley, 61 F.3d 1358, 1363 (8th Cir. 1995) (Bright, J., concurring) ("These unwise sentencing policies which put men and women in prison for years, not only ruin lives of prisoners and often their family members, but also drain the American taxpayers of funds which can be measured in billions of dollars."); United States v. O'Meara, 895 F.2d 1216, 1221 (8th Cir. 1990) (Bright, J., dissenting in part and concurring in part) ("This cases opens the window on the sometimes bizarre and topsy-turvy world of sentencing under the Guidelines."). Regrettably, the primary consideration under our present sentencing scheme is not criminality, but rather on the weight of the drugs charged to a defendant plus the information a defendant will give to his or her prosecutor. In this case, the kingpin (Sykes) and other primary actors in the conspiracy had something to sell in exchange for lighter sentences: information on underlings. For informing on lesser partners in crime, the kingpins received reduced sentences for "acceptance of responsibility." "Acceptance of responsibility" reductions are usually more of a reward for being a snitch rather than a recognition of true repentance. For their part, the underlings are rarely privy to workings of the overall conspiracy and consequently have nothing to sell to the prosecutor. The circumstances in this case compel me to repeat what I stated in United States v. Griffin:

> What kind of a criminal justice system rewards the drug kingpin or near-kingpin who informs on all the criminal colleagues he or she has recruited, but sends to prison for years and years the least knowledgeable or culpable conspirator, one who knows very little about the conspiracy and is without information for the prosecutors?

Griffin, 17 F.3d 269, 274 (8th Cir. 1994) (Bright, J., dissenting).

-13-

## II. Plain Error – Calculation of Drug Amounts Against Jones

Even under the Sentencing Guidelines, the district court committed clear error in calculating the drug amounts attributable to Jones.[5] For a defendant to be sentenced for drugs distributed by his or her co-conspirators, the distribution of drugs must have been: "(1) in furtherance of the conspiracy and (2) reasonably foreseeable to [the defendant]." See United State v. Montanye, 962 F.2d 1332, 1347 (8th Cir. 1992), rev'd on other grounds, 996 F.2d 190 (8th Cir. 1993) (en banc) (citations omitted). "For activities of a co-conspirator to be reasonably foreseeable to a defendant, they must fall within the scope of the agreement between the defendant and the other conspirators." Id. (citation omitted).

What would the reader of this opinion think about a thirty-year prison sentence for an eight- or nine-year-old boy (the mental level at which Jones functions), who was charged with drug distribution? A person of this level of intelligence is not likely to comprehend the scope of the conspiracy. Simply stated, Jones did not possess the mental capacity to comprehend the drug distribution scheme beyond performing the tasks that he was ordered to do. Therefore, the district court should have rejected the Presentence Report's conclusion that Jones was responsible for almost the entire amount of drugs sold by the conspiracy, or at least held a hearing on this issue.

---

[5]As reflected in the Presentence Report, the probation officer accepted the government's testimony that the overall conspiracy sold about one ounce (28.35 grams) of heroin per day between the Winter of 1986 and May of 1994, totaling 77.42 kg of heroin. PSR at p.8, ¶ 24. Furthermore, the probation officer credited testimony that for three weeks during the Summer of 1994, the conspiracy sold approximately one ounce (28.35 grams) of cocaine per day, for a total of 595.35 grams of cocaine. Id. The probation officer concluded that because Jones entered the conspiracy soon after it began, Jones was responsible for 71.5 kg (almost all of the total amount) of heroin and 595.35 grams (the entire amount) of cocaine. Id.; Add. to PSR at #5.

-14-

In attempting to justify the length of Jones' sentence, the government contends that Jones played an elevated role in the conspiracy ring. Specifically, the government notes the following factors: (1) Jones joined the conspiracy near the beginning; (2) Sykes considered Jones one of his most trusted employees; and (3) Jones trained and supervised new street-level sellers.

The government's position lacks substantial merit. The fact that Jones joined the conspiracy near the beginning indicates nothing as to Jones' role in the conspiracy. Furthermore, Sykes would no doubt consider Jones a trusted employee because Jones did only what Sykes and others told him to do and knew nothing of the overall scheme. Finally, the duties of street-level drug seller in this conspiracy included driving a vehicle to a designated area and exchanging drugs for money. Consequently, Jones' "training" and "supervision" of new street-level sellers hardly suggests that Jones possessed advanced mental capabilities. Interestingly, the government itself presented evidence indicating over 500 telephone calls between Jones and Sykes during a three-month period. This evidence shows that because of Jones' reduced mental capacity, he needed constant and perhaps repeated directions to even carry out the simplest duties of the conspiracy.

The record also discloses that although the Presentence Report describes at length the activities of different members of the conspiracy, the Presentence Report makes only brief mention of Jones' role. Specifically, the Presentence Report makes only the following notations in reference to Jones: (1) Jones (with Bruce Lee) sold an undercover detective .98 grams of black tar heroin; (2) a confidential informant told police that several individuals, including Jones, were involved in selling heroin in the St. Louis, Missouri area; (3) during 1987, Jones joined the Sykes' conspiracy, at which time the co-conspirators began selling increased amounts of heroin and cocaine in button form; (4) Sykes utilized several individuals, including Jones, to distribute the heroin in the St. Louis, Missouri area; and (5) when police arrested Jones, he was carrying a gun. If Jones had such an elevated position in Sykes' drug scheme, the

-15-

Presentence Report would certainly contain more notations concerning Jones other than repeating that which is undisputable--Jones sold drugs for Sykes on the street. Indeed, nothing in the Presentence Report supports the government's attempt to paint Jones as anymore than an unintelligent low-level drug seller.

Finally, I must comment on one further aspect of this case, which is the high cost and relatively low benefit of incarcerating large numbers of drug offenders for excessively long periods of time. In this case, the government obtained the conviction of twenty-one defendants, resulting in sentences exceeding 204 years. Based upon 1995 figures and excluding the inflation factor, the cost of incarcerating all the defendants from this conspiracy alone totals almost $4.5 million.[6]

The imposition of excessive sentences produces a tremendous monetary cost to the government and therefore the taxpayers. A United States Department of Justice analysis, released on February 4, 1994, showed that 16,316 federal prisoners incarcerated on drug charges were low-level drug offenders.[7] These low-level drug offenders were non-violent, had previously experienced little or no contact with the criminal justice system, and played only low-level or peripheral roles in drug distribution schemes. U.S. Dep't of Justice, An Analysis of Non-Violent Drug Offenders with Minimal Criminal Histories, p.6 (1994).

Yet, these low-level offenders received average sentences of 6.8 years, primarily due to mandatory minimums. In fact, two-thirds of the low-level drug offenders

---

[6]In Fiscal 1995, we estimate the average cost per day per inmate will be $60.26, with an average annual amount of $21,995. Letter from Kathleen M. Hawks, Director, United States Department of Justice, Federal Bureau of Prisons, to the Honorable Myron H. Bright (July 6, 1995) (on file with Judge Bright).

[7]According to the same study, low-level drug offenders comprised 36.1% of all incarcerated drug offenders.

received mandatory minimum sentences. In 1994, the Federal Judicial Center released a study on the effect of mandatory minimums and current guideline sentencing. That study provided:

> We know from previous work by the Bureau of Prisons that 70% of the prison growth related to sentencing since 1985 is attributed to increases in drug sentence length. "(D)rug law offenders alone are consuming three times more resources than all other federal crimes combined. . . unless Congress and the Sentencing commission change drug sentences, relief will be nowhere in sight.

Federal Judicial Center, <u>The Consequences of Mandatory Minimum Prison Terms: A Summary of Recent Findings</u>, p.6 (1994).

In <u>Hiveley</u>, 61 F.3d at 1363-64, this writer discussed the enormous costs of incarcerating drug offenders for excessive periods of time:

> This is the time to call a halt to the unnecessary and expensive cost of putting people in prison for a long time based on the mistaken notion that such an effort will win "The War on Drugs." If it is a war, society seems not to be winning, but losing. We must turn to other methods of deterring drug distribution and use. Long sentences do not work . . . and penalize society.

Jones, age thirty-five at the time of sentencing, will probably spend the rest of his natural life in prison (assuming he lives to age 65 in prison). The cost to the taxpayers for this incarceration will probably exceed $750,000. If this sentence is lawful, it does not serve the cause of justice or the public interest.

## III.    Disparity and Inequity

United States District Judge Vincent L. Broderick[8] of New York spoke to the Subcommittee on Crime and Criminal Justice of the Committee on the Judiciary of the House of Representatives at the Congress of the United States almost five years ago (July 28, 1993).  See VINCENT L. BRODERICK, STATEMENTS BY VINCENT L. BRODERICK BEFORE THE SUBCOMMITTEE ON CRIME AND CRIMINAL JUSTICE OF THE COMMITTEE ON THE JUDICIARY OF THE HOUSE OF REPRESENTATIVES (1993) [hereinafter "Statement of Vincent L. Broderick"].

At that time, Judge Broderick served as chair of the Committee on Criminal Law of the Judicial Conference of the United States.  He spoke as an experienced, practical and intelligent federal judge on behalf of the Committee and indeed federal judges everywhere.[9]  Judge Broderick was no soft-headed judge.  He had served as a deputy police commissioner in New York, then police commissioner and as a prosecutor.  He had served as a federal district judge since 1976.

In no uncertain terms he told the subcommittee that mandatory minimum sentences which drive guideline sentencing in many cases make it "impossible for the judge, today, fairly and honestly to perform his or her role."  (Statement of Vincent L. Broderick, at 4).  He spoke of the "unfairness of sentencing that results from mandatory

---

[8]Judge Broderick died on March 3, 1995.  The Pace University Law Review published a tribute to this fine jurist.  16 Pace L. Rev. 187 (Winter 1996).

[9]As the concurring opinion noted in United States v. Hiveley, 61 F.3d 1358, 1364 (8th Cir. 1995) that 86.4% of federal sentencing judges support changing current sentencing rules.

minimum sentences and some of the characteristics of the federal mandatory system that exacerbate unfairness, particularly for drug offenses." Id.[10]

The Broderick statement concerning the unfair impact of sentences based on mandatory minimum penalty statutes is graphically illustrated by the instant Jones' sentence. Jones' sentence of thirty years under the guidelines is driven and controlled by a mandatory minimum sentence of at least ten years--twenty years where a prior felony existed against the offender. The mandatory minimum applies to 1 kg or more of heroin. In this case, the probation officer (not the judge) attributed 71.5 kg. of heroin to Jones and certain others in the conspiracy by an estimate that from the winter of 1986 to June 1994, the conspiracy distributed an average of one ounce of heroin per day for a total of 77.42 kg of heroin.

The attribution to Jones, 71.5 kg of heroin, rested not on his actual sales nor his knowledge of the extent of the conspiracy but apparently on the days and weeks he served the conspiracy. As we have already observed, Jones, the low person on the totem pole, received the harshest sentence.

The reason for such an unfair sentence in a drug case can be explained by Judge Broderick's comments. We quote them in part below:

    **1.**    **Mandatory minimums are inherently unfair because their application depends, in most cases, upon the presence of only one factor.**

        An inherent vice of mandatory minimum sentences is that they are designed for the most culpable criminal, but they capture many who are

---

[10]The Broderick statement noted that more than 100 federal mandatory minimum penalties exist in 60 criminal states but four statutes, these dealing with drug offenses, account for 94% of cases where mandatory minimum sentences have been imposed.

considerably less culpable and who, on any test of fairness, justice and proportionality, would not be ensnared.

(Statement of Vincent L. Broderick, at 7).  Those comments apply in this case.

### 2. Unfairness of Quantity Based Mandatory Minimum Sentences.

Use of the amounts of drugs by weight in setting mandatory minimum sentences raises issues of fairness because the amount of drugs in the offense is more often than not totally unrelated to the role of the offender in the drug enterprise.  Individuals operating at the top levels of drug enterprises routinely insulate themselves from possession of the drugs and participation in the smuggling or transfer functions of the business.  It is the participants at the lower levels--those that transport, sell, or possess the drugs--that are caught with large quantities.

Id. at 10.  Those comments apply in this case.

### 3. Unfairness of Mandatory Minimum Drug Sentences Based on Weight Without Regard for Purity.

Since the relation of the carrier medium to the drug increases as the drug is diluted in movement to the retail level, the unfairness of imposing automatic sentences based on amount without regard to role in the offense is compounded by failure to take purity into account.

Id. at 11.  These comments do not apply to Jones.

### 4. Unfairness in Applying Conspiracy Principles to Mandatory Minimum Drug Sentences.

Another significant factor of unwarranted unfairness in mandatory minimum sentencing is the application of conspiracy principles to

quantity-driven drug crimes. Under the <u>Pinkerton</u> doctrine of conspiracy, accomplices with minor roles may be held accountable for the foreseeable acts of other conspirators in furtherance of the conspiracy. A low-level conspirator is subject to the same penalty as the kingpin. . . .

<u>Id.</u> at 11-12. This comment applies here.

**5.      Unfairness For Failure to Take Role in the Offense into Account in Setting Mandatory Minimum Sentences.**

Failure to permit the sentencing judge to take into account the role of the offender in the offense, particularly for business enterprise type offenses, is probably the most central unfairness factor in mandatory minimum sentencing. Indeed, role in the offense is far more reflective than amount of drugs of the dangerousness and culpability of the individual and of his or her reward from, and level in, the criminal enterprise.

<u>Id.</u> at 12. This comment applies here.

**6.      Unfairness in the Operation of the "Substantial Assistance" Factor with Respect to Mandatory Minimum Sentences.**

An ostensible purpose of mandatory minimums is to remove discretion from the sentencing process. It is axiomatic that there is no departure from a mandatory minimum under current federal law.

No departure, that is, unless the prosecutor initiates it.

. . . The government (prosecutor) exclusively holds this authority. Problems of inequities arise for three reasons; the more culpable offenders have more information to bargain with than low-level offenders who may have limited contact with conspirators; there are serious inherent incentives to perjury; and prosecutors indulge a wide variety of unstructured practices with respect to substantial assistance motions.

Who is in a position to give such "substantial assistance?"  Not the mule who knows nothing more about the distribution scheme than his own role, and not the street-level distributor.

. . . .

There is no apparent consistency or uniformity between various United States Attorney's offices in the making of "substantial assistance" motions. . . .

These sentencing results, affected by decisions related to prosecutorial discretion, raise concerns regarding the sentencing objectives of certainty of punishment, proportionality, and unwarranted disparity.

Id. at 13-15.

How true those observations are in number 6 as applied to Jones and his co-conspirators!  We have attached as appendix A to this dissent a tabulation of the sentences imposed on the twenty-one members of the conspiracy which graphically demonstrates that consistency in mandatory minimum and guideline sentencing is a myth. The sentences ranged from a low of eighteen months to 360 months (thirty years for Jones).  All offenders were subject to mandatory minimum sentences of at least five years.[11]

---

[11]We also know from United States v. Romero, 118 F.3d 576, 582-83 (8th Cir.) (Bright, J., dissenting), modified, 128 F.3d 1198 (8th Cir.), cert. denied, 118 S. Ct. 611 (1997), an appeal of several of Jones' co-conspirators, that a father sold out the mother of his children presumably for sentence consideration by the prosecutor.  Interestingly, the Presentence Report in the instant case now reveals that Graseda, the father who turned on Romero, the mother of his children, received 24 months to the mother's mandatory minimum of 60 months (five years).

**7.      Unfairness in Application of Mandatory Minimum Sentences.**

> In thirty-five per cent of the cases where the facts seemed to warrant a mandatory minimum sentence, the defendants involved pleaded guilty to statutes or crimes carrying non-mandatory minimum sentencing provisions. This phenomenon should not come as a big surprise. Studies show that mandatory minimum sentencing practices influence participants at every level in the process--the investigator, the prosecutor, the jury, and the judges--as each reacts to ameliorate broadly perceived unfairness.

Id. at 16-17. That observation may apply here.

**8.  Unfairness Related to Effect of Mandatory Minimum Sentences on Sentencing Guidelines.**

> The mandatory minimums have also had the effect of skewing onwards and upwards the sentences which the Guidelines prescribe, as the Sentencing Commission has attempted to achieve proportionality while adapting to the mandatory minimums.

. . . .

> Thus mandatory minimum penalties have hindered the development of proportionality in the Guidelines, and are unfair not only with respect to offenders who are subject to them, but with respect to others as well.

Id. at 17-18. Certainly that observation applies to Jones. The guidelines applied proportionately upward to his ten-year mandatory minimum produced his thirty-year sentence.

Judge Broderick also addressed his remarks to the high cost to the public of unnecessary lengthy prison sentences.

Mandatory minimum sentences and related distortions of the Sentencing Guidelines have institutionalized long-term incarceration as the preferred method of dealing with crime in this country, particularly drug crime. More people are warehoused in federal and state prisons than at any other time in our history. The United States has the highest per capita incarceration rate of any of the modern industrial countries.

. . . .

In turning to prisons as a primary answer to our crime problems, we have embarked upon a prison expansion that will cost hundreds of million dollars to build and billions of dollars annually to operate. The end is not in sight unless we reassess our options for managing offenders by evaluating less costly alternatives with two goals in mind: cost to the taxpayers and safety in the community for those taxpayers.

Id. at 21-23.

Many judges have written on the injustice and unfairness of the prison sentence structure for federal crimes particularly drug related crimes. It is time for the public and Congress to pay heed to these voices. In the end, it is the public that pays the cost of a grossly unsound system.

## IV.    Conclusion

I would vacate the sentence in this case for plain error and call upon the district judge to take another look at the sentence.

A true copy.


Attest:


CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.


## APPENDIX A

### Compiled from the Presentence Report and the Appendix


* <u>Andrew Jones</u>                                               360 months
Street-Level Drug Seller


* <u>Eluterio Reyes</u>                                             276 months
Primary Drug Supplier
Did <u>NOT</u> Cooperate With the Government
Did <u>NOT</u> Testify at Jones' Trial


* <u>Lamond Sykes</u>                                               276 months
Mastermind of the conspiracy
Did <u>NOT</u> Cooperate With the Government
Did <u>NOT</u> Testify at Jones' Trial


* <u>Roberta Farr</u>                                               24 months
Downward Departure for Substantial Assistance


* <u>Derek Conway</u>                                               120 months
Accountable for 1-3 kg of Heroin

Faced a 120-Month Mandatory Minimum[12]

* <u>Stephanie Sykes</u>                                    18 months
Accountable for 28 kg of Heroin
Faced a 120-Month Mandatory Minimum
Downward Departure for Substantial Assistance

* <u>Felton Jerome Sykes</u>                                84 months
Accountable for 28 kg of Heroin
Faced a 120-Month Mandatory Minimum
Downward Departure for Substantial Assistance

* <u>Ken Braddock</u>                                       210 months
Accountable for 28 kg of Heroin
Faced a 120-Month Mandatory Minimum

* <u>Cordia Thomas</u>                                      60 months
Accountable for 28 kg of Heroin
Faced a 120-Month Mandatory Minimum
Downward Departure for Substantial Assistance

* <u>Francis Weekly</u>                                     188 months
Accountable for 28 kg of Heroin
Faced a 120-Month Mandatory Minimum

* <u>Sally Sluggett</u>                                     72 months
Accountable for 28 kg of Heroin
Faced a 120-Month Mandatory Minimum
Downward Departure Substantial Assistance

---

[12]The record in this case does not contain the criminal histories of all the co-conspirators.  Consequently, the mandatory minimums stated in this table do not reflect any prior drug felony convictions by the defendants.  If a defendant had a prior drug felony, the defendant would have faced a 240-month mandatory minimum sentence rather than 120-month mandatory minimum.

\* <u>Adonis Smith</u>                                         135 months
Accountable for 28 kg of Heroin
Faced a 120-Month Mandatory Minimum

\* <u>Bruce Lee</u>                                            84 months
Accountable for 28 kg of Heroin
Faced a 120-Month Mandatory Minimum
Downward Departure Substantial Assistance

\* <u>Wayne Fly</u>                                            120 months
Accountable for 28 kg of Heroin
Faced a 120-Month Mandatory Minimum

\* <u>Terry Martin</u>                                         84 months
Accountable for 28 kg of Heroin
Faced a 120-Month Mandatory Minimum
Downward Departure Substantial Assistance

\* <u>Danny Craig</u>                                          36 months
Accountable for 28 kg of Heroin
Faced a 120-Month Mandatory Minimum
Downward Departure Pursuant to U.S.S.G. §5K2.0.

\* <u>Beverly Leach</u>                                        18 months
Accountable for 1-3 kg of Heroin
Faced a 120-Month Mandatory Minimum
Downward Departure (Aberrant behavior)

\* <u>Cherylyn Jones</u>                                       168 months
Accountable for 28 kg of Heroin
Faced a 120-Month Mandatory Minimum
Downward Departure Substantial Assistance

\* <u>Joanne Jones</u>        36 months
Accountable for 28 kg of Heroin
Faced a 120-Month Mandatory Minimum
Downward Departure
(No Prior Criminal History & Substantial Family Obligations)

\* <u>Donna Romero</u>        60 months
Accountable for 256.8 grams of Heroin
Faced a 60-Month Mandatory Minimum

\* <u>Antonio Graseda</u> (father of Romero's children)        24 months
Accountable for 256.8 grams of Heroin
Faced a 60-Month Mandatory Minimum
Downward Departure Substantial Assistance