# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3380

_____

United States of America,        *

                             *

        Plaintiff - Appellee,   *

                             *  Appeal from the United

      v.                    *  States District Court for the

                             *  Northern District of Iowa.

Mingo Flores,              *

                             *

        Defendant - Appellant.   *

_____

Submitted: May 13, 2003
Filed: July 18, 2003

_____

Before LOKEN, Chief Judge, BRIGHT and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Mingo Flores pled guilty to possessing with intent to distribute approximately 391 grams of lysergic acid diethylamide (LSD), in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). The district court[1] sentenced him to 235 months after departing upward from the sentencing guidelines. Flores appeals his sentence, and we affirm.

On April 28, 2001, Flores shot a man named Steve Huerta, who was one of his

_____

[1] The Honorable Mark W. Bennett, Chief Judge, United States District Court for the Northern District of Iowa.

drug suppliers and who was also romantically involved with his sister, Vicki Flores. While Mingo Flores was riding in a car, he saw Steve and Vicki arguing in an alley in Mason City, Iowa. After the car stopped and Flores got out, Vicki told him to shoot Huerta. Flores pulled out a .45 caliber handgun and fired five times at Huerta, hitting him twice in the legs. Huerta was taken to the hospital and survived. Flores was 17 years old at the time of the attack.

The police investigating the incident received two anonymous reports which identified Flores as the shooter, and they obtained a search warrant for the apartment where he was living. The officers arrested Flores at his apartment for attempted murder and then conducted a search, during which they found 81 sugar cubes laced with 391 grams of LSD and one half milliliter of liquid LSD. They also seized drug notes, drug related paraphernalia, and a digital scale.

Flores pled guilty to the federal charge of possessing with intent to distribute approximately 391 grams of LSD, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). A state charge of attempted murder was dropped when Flores agreed that he would plead guilty to a reduced charge of terrorism after his federal sentencing.

On September 10, 2002, Flores came before the district court for sentencing. The court increased his offense level under the guidelines by two levels under § 2D1.1(b)(1) for possession of a dangerous weapon. See United States Sentencing Commission, Guidelines Manual, § 2D1.1(b)(1) (Nov. 2001) [USSG]. The court then reduced his offense level by three for acceptance of responsibility under USSG § 3E1.1 and calculated his adjusted offense level to be 25. The presentence investigation report (PSR), to which Flores made no substantive objection, determined that he was in criminal history category IV. This called for a statutory 10 year minimum sentence. See 18 U.S.C. 841(b)(1)(A); USSG Ch.5, Pt.A.

The court found, however, that criminal history category IV did not adequately reflect the seriousness of Flores' past criminal conduct or the likelihood that he would commit future crimes. The court stated that even though he was only 18 years old at the time of sentencing, Flores' criminal history, which began at age seven, was "one of the more extensive and violent . . . that [it had] seen in the nearly 700 criminal defendants sentenced." United States v. Flores, No. CR01-3052MWB, mem. op. at 5 (N.D. Iowa Sept. 11, 2002).[2]

The district court decided to depart upward under USSG § 4A1.3 to criminal history category VI, which provides a sentencing range of 110 to 137 months for offense level 25. USSG Ch.5, Pt.A. Since this range was still inadequate, it departed further to offense level 31, which at criminal history category VI results in a range of

---

[2]The PSR reveals that Flores has been arrested on more than 25 criminal charges. The district court adopted the following summary of Flores' criminal history in its sentencing memorandum:

> The defendant has a significant juvenile record involving three adjudications [of delinquent] for assault with dangerous weapons (brandishing a knife), assault, refusing to obey a lawful order, theft—fourth degree, interference with official acts, possession of marijuana, and public intoxication. He had two juvenile cases (carrying weapons and attempted third degree burglary) waived to adult court. The carrying weapons offense involved threatening a person with a .30 caliber handgun. The defendant also had prior juvenile dispositions for theft—fifth degree (three separate cases), carrying a concealed weapon (a butterfly knife), and disorderly conduct. Furthermore, he has other arrests for criminal mischief—fourth degree (two arrests), burglary—third degree, serious assault (two arrests), making homemade explosives, threats with weapons, theft—second degree, theft from vehicles, harassment, public intoxication, and attempted murder as well as two status offenses.

Flores, mem. op. at 5.

188 to 235 months.[3] Id. The court noted that if Flores had been 18 at the time of the drug offense and had pled guilty to the state charge before the sentencing in this case, he would have been deemed a career criminal under the guidelines. That would have meant a guidelines range of 262 to 327 months. See id.; id. § 4B1.1. Flores was then sentenced to 235 months. On appeal, Flores contends that the court erred in departing upward and that it imposed an unreasonable sentence.

Congress has recently modified the standard of review for departures from the sentencing guidelines. See PROTECT Act, Pub. L. No. 108-21, § 401(d), 117 Stat. 650 (2003) (amending 18 U.S.C. § 3742(e)).[4] Whether the district court based a departure on a permissible factor and whether it provided the written statement of reasons now required for a departure is to be reviewed de novo.[5] § 3742(e). A

---

[3]The court stated that the departure to offense level 31 could be based on either § 4A1.3 or § 5K2.0 of the guidelines. See § 4A1.3, p.s. (If "the guideline range for Criminal History Category VI is not adequate . . . . a departure above the guideline range . . . may be warranted . . . . [and] should [be] structure[d] . . . by moving incrementally down the sentencing table to the next higher offense level . . . until [the court] finds a guideline range appropriate to the case."). Because we decide that the departure is permissible under § 4A1.3, we do not consider the court's invocation of § 5K2.0.

[4]When asked at oral argument about the PROTECT Act's passage on April 30, 2003 and its modified standard of review, neither party disagreed with application of that standard to this case or raised any issue of retroactivity. We assume without deciding that the new standard of review applies, but we would also affirm under the previous more deferential standard.

[5]Under 18 U.S.C. § 3553(c)(2), as amended by § 401(c) of the PROTECT Act, if a district court departs from the guideline range, its "reasons [for departing] must . . . be stated with specificity in the written order of judgment and commitment." § 3553(c)(2). Here the district court attached a brief written statement to the order of judgment but presented a more detailed discussion of its reasons for departing in a memorandum opinion issued relating to the judgment. Neither party has challenged the sufficiency of the district court's written statement in this case.

sentencing court's factual findings are still reviewable for clear error and the reasonableness of a permissible departure for abuse of discretion.  Id.

A factor is a permissible basis for departure if it "advances the objectives set forth in [18 U.S.C. §] 3553(a)(2)," "is authorized under [18 U.S.C. §] 3553(b)," and "is justified by the facts of the case."  18 U.S.C. § 3742(j)(1).  In this case, the district court identified as factors supporting an upward departure the failure of Flores' criminal history category to reflect adequately the seriousness of his past criminal conduct and his potential to recidivate.  For several reasons, we conclude that these factors are permissible grounds for upward departure in this case.

By taking account of the seriousness of Flores' past criminal conduct and his potential for recidivism, the district court advanced the statutory sentencing objectives of "afford[ing] adequate deterrence to criminal conduct," § 3553(a)(2)(B), and "protect[ing] the public from further crimes of the defendant,"  § 3553(a)(2)(C).  As the guidelines explain, "[g]eneral deterrence of criminal conduct dictates that . . . repeated criminal behavior . . . aggravate the need for punishment," USSG Ch.4, Pt.A intro. comment., and keeping a likely recidivist incarcerated clearly protects the public.  Furthermore, § 3553(b)(1) authorizes a court to depart based on a factor that was "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines."  By explicitly authorizing departures under USSG § 4A1.3, the Commission has acknowledged that it could not adequately account for all circumstances that might arise in individual cases such as where "reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes."  USSG § 4A1.3, p.s.; see also id. Ch.1, Pt.A intro. comment. 4(b).  The factors relied on by the district court were thus specifically authorized by § 4A1.3 and 18 U.S.C. § 3553(b).

Moreover, the facts of the case indicate that Flores was not a typical category

IV offender. There was no substantive objection to the facts contained in the PSR, and they provide reliable information indicating that the calculation of Flores' criminal history category omits much of his past criminal conduct and does not reflect the likelihood that he would victimize others in the future if not deterred. It did not take into account serious conduct for which he was arrested, but either not formally charged or convicted. This includes the manufacture of two homemade bombs, several violent assaults, and acts of burglary and theft. Even the shooting of Huerta is not reflected in his criminal history score because Flores was allowed to proceed with this federal sentencing before he pled to the state charge. Other incidents of juvenile criminal behavior were also not reflected in his criminal history because of the manner in which they were handled and the five year limitation on counting juvenile sentences under USSG § 4A1.2(d). Several thefts, a weapons charge, and a disorderly conduct were dealt with through informal dispositions or warnings that did not result in sentences includible in a criminal history score calculation. The guidelines indicate that an upward departure under § 4A1.3 is especially appropriate "in the case of younger defendants . . . who are more likely to have received repeated lenient treatment, yet who may actually pose a greater risk of serious recidivism than older defendants." USSG § 4A1.3 comment.

We conclude that because of Flores' extensive history of wrongdoing and his inability to reform despite the leniency frequently afforded him, his criminal history category "does not adequately reflect the seriousness of the [his] past criminal conduct or the likelihood that the [he] will commit other crimes," USSG § 4A1.3, and that an upward departure "is justified by the facts of th[is] case," 18 U.S.C. § 3742(j)(1)(C); cf. United States v. Vagenas, 318 F.3d 819, 821 (8th Cir. 2003) (§ 4A1.3 upward departure appropriate "where there is evidence of obvious incorrigibility" (internal quotation marks omitted)). The district court did not therefore err in departing upward based on the inadequacy of Flores' criminal history category.

Flores argues that even if a departure were permissible, an upward departure of 115 months beyond the 120 month mandatory minimum sentence is unreasonable. Flores' criminal history is a record of frequent and often violent criminal behavior that culminated in the sudden shooting of Steve Huerta. His repeated encounters with the criminal justice system have proved incapable of deterring him from further illegal activity. The guidelines explain that when sentencing offenders with records of past criminal conduct, a court must consider the need to "protect the public from further crimes of the . . . defendant," USSG Ch.4, Pt.A, intro. comment., and to send "a clear message . . . to society that repeated criminal behavior will aggravate the need for punishment with each recurrence," id. In light of these considerations and based on this record, we cannot conclude that the court abused its discretion by the extent of its departure.

Flores also suggests that it was inappropriate for the district court to consider that he almost qualified for career offender status, but the court only used the career offender range as an indicator of a reasonable sentence for someone with a criminal history as extensive as his. The sentence imposed by the district court was 27 months less than the minimum sentence that would have applied to Flores as a career offender, and the district court did not abuse its discretion with respect to the reasonableness of the sentence.[6]

For these reasons, we affirm the judgment of the district court.

_____

[6]We also reject the argument that the district court's departure was an impermissible effort to punish Flores for the Huerta shooting which had not yet resulted in a conviction. We have carefully reviewed the record and the district court's thorough memorandum opinion, and we cannot say that the court erred in taking note of the shooting. So long as previous criminal conduct is shown by "reliable information," it may be considered by a sentencing court even in the absence of conviction. USSG § 4A1.3, p.s.; accord United States v. Joshua, 40 F.3d 948, 953 (8th Cir. 1994). In this case, the uncontested facts in the PSR establish that Flores shot Huerta.

BRIGHT, Circuit Judge, concurring.

I write separately to emphasize the importance of a district judge's decision-making role in sentencing criminal offenders. In this case, the Honorable Mark W. Bennett, Chief Judge, United States District Court for the Northern District of Iowa, is a very able and experienced judge. As the majority notes, he wrote an extensive opinion explaining in detail why this offender should have a substantial increase in sentence above the Guidelines range. His analysis is careful, thorough, and appropriate.

Chief Judge Bennett elected to sentence above the Guidelines and we approve because he exercised his discretion with care and diligence. Chief Judge Bennett has also sentenced below the Guidelines in careful appraisals of the offenders and the offenses as have other United States district judges. He has also interpreted ambiguous sentencing provisions in a fair and judicious way. See, e.g., United States v. Madrigal, 327 F.3d 738 (8th Cir. 2003).

I write separately in this case to emphasize that Chief Judge Bennett is typical of the able, intelligent, and perceptive district judges who serve the federal judiciary and impose sentences on federal offenders. This court and every court ought to give due deference to the sentencing decisions of the district judge. However, the Sentencing Guidelines and other changes limit the discretion of the district judge. This does not mean that sentencing disparities have been eliminated or that injustice does not exist, because it does. What it has come to mean is that much of the discretion in sentencing decisions unfortunately falls to persons far less qualified to judge an offender than the district judge. While we say the district judge sentences the offender, in fact, the prosecutor, as I have shown in a number of opinions, often has more input into the sentence to be imposed than does the district judge. The sentencing process also can become mechanical when a probation officer figures out the mathematical aspects of what constitutes a sentence under the guidelines.

In his opinion, Chief Judge Bennett recognized the injustices of always sentencing under the Guidelines, as presently construed and administered by the federal courts and the appellate courts, and noted many cases, some from my dissenting or concurring opinions. Chief Judge Bennett wrote:

> While the undersigned shares many of the views expressed by Senior Circuit Judge Myron H. Bright in several of his concurrences and dissents in which he condemns the harsh injustices that application [of] the Federal Sentencing Guidelines imposes, the court finds that this case presents an exception and that a departure is entirely justified by Flores's demonstrated propensity for violence, his recidivist nature, and the need to protect society.

United States v. Mingo Flores, No. 01-3052, at 30-31 n.9 (N.D. Iowa filed Sept. 11, 2002).[7]

---

[7]See, e.g., United States v. Sweesy, 272 F.3d 581, 583-84 (8th Cir. 2001) (Bright, J., dissenting) (noting that "[j]udges should take into account that many guideline drug sentences are often heavier than is warranted by the nature of the crime. This is where a district judge's discretion becomes important and where the judge often should take advantage of the provisions that permit reducing sentences under the guidelines."); United States v. Jones, 145 F.3d 959, 966 (8th Cir. 1998) (Bright, J., dissenting in part and concurring in part) ("The sentence of Jones, a man with the mind of a child, to thirty years of incarceration makes a mockery out of the phrase, 'Equal Justice Under the Law.' In this case, the lowest person on the totem pole, a mere street-level seller with an I.Q. of fifty-three received a heavier sentence than the mastermind of the conspiracy and the conspiracy's primary drug supplier. What kind of system could produce such a result? This case provides yet another example of how rigid sentencing guidelines and the mandatory minimums associated with drug cases make an unfair 'criminal' system.") (footnote omitted); Montanye v. United States, 77 F.3d 226, 233 (8th Cir. 1996) (Bright, J., dissenting) ("By any ordinary measure outside the guidelines, I would think this sentence would be considered draconian, unnecessarily harsh and unreasonable."); United States v. Hiveley, 61 F.3d 1358, 1363, 1365 (8th Cir. 1995) (Bright, J., concurring) ("[U]nwise sentencing policies which put men and women in prison for years, not only ruin lives . . . but also drain the American

For a fair and proper sentencing procedure some discretion should be under the aegis of the sentencing judge. Recently (December 2002), the United States Sentencing Commission published a "Summary Report" on a survey of Article III judges. This summary is a component of the fifteen-year report on the United States Sentencing Commission's legislative mandate. That report read in part:

**Areas of Least Effectiveness in Meeting the Sentencing Goals**

A plurality of both responding district and circuit court judges indicated that there were two areas in which the guidelines were less effective in achieving the purposes of sentencing:

---

taxpayers. . . . [It is] time to call a halt to the unnecessary and expensive cost of putting people in prison for a long time based on the mistaken notion that such an effort will win 'The War on Drugs' . . . . The public needs to know that unnecessary, harsh and unreasonable drug sentences serve to waste billions of dollars without doing much good for society. We have an unreasonable system."); United States v. Smiley, 997 F.2d 475, 483 (8th Cir. 1993) (Bright, J., dissenting) (suggesting that sentences imposed under the Guidelines where no rules of evidence apply and where sentencing judges often summarily approve probation officer recommendations seem to come from an *Alice in Wonderland* world where up is down and down is up); United States v. Galloway, 976 F.2d 414, 438 (8th Cir. 1992) (Bright, J., dissenting) (comparing sentences imposed under the relevant conduct provisions of the Guidelines to an *Alice in Wonderland* world in which words lose their real meaning and down is up and up is down); United States v. England, 966 F.2d 403, 411 (8th Cir. 1992) (Bright, J., concurring) ("In too many instances, the sentences directed by the guidelines waste the lives of men and women. . . . *It is time for a re-evaluation and change.*"); United States v. Simmons, 964 F.2d 763, 778 (8th Cir. 1992) (Bright, J.) (commenting that "[t]his case and other drug convictions like it demonstrate that, under the Sentencing Guidelines, district judges are obligated to sentence first-time drug offenders to extremely long prison terms under evidence which is often haphazardly produced and considered without regard to traditional rules of evidence. The guidelines procedure has chosen to bypass adherence to rules of evidence which have developed over hundreds of years in the common law tradition to assure reliability in factfinding.")

– providing defendants with training, medical care, or treatment in the most effective manner, where rehabilitation was appropriate (Q5) and

– maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors (Q9).

Approximately 40 percent of responding district court judges, and slightly more responding circuit court judges, reported that few of their cases met these sentencing goals.

United States Sentencing Commission, Summary Report, at 2 (Dec. 2002).

The federal guideline system has been the subject of comment by the American Law Institute[8] in its report, *Model Penal Code: Sentencing Report* (April 2003):

Although the federal sentencing system is but one of 16 jurisdictions that currently operate with sentencing guidelines fashioned by a sentencing commission (with additional guideline reforms now in progress in several new jurisdictions), it is by far the best known and most criticized of all commission-guidelines structures. Michael Tonry has gone so far as to say that "[t]he guidelines developed by the U.S. Sentencing Commission . . . are the most controversial and disliked sentencing reform initiative in U.S. history." In contrast, state commission-guideline systems have enjoyed general acceptance and support among the lawyers and judges who regularly use them.

_____

[8]The American Law Institute organized in 1923, consists of approximately 3000 judges, lawyers, and law teachers elected on the basis of professional achievement and demonstrated interest in the improvement of law. Among other things, the organization engages in activities to improve the law and instigates the study and drafting of model statutory formulations, such as the Model Penal Code, the Model Code of Evidence, and a proposed Federal Securities Code. The references in this concurring opinion are to a report of the American Law Institute on its newly drafted Model Penal Code on sentencing, released April 11, 2003.

Id. at 115 (footnotes omitted). "The proposed Model Penal Code structure, and all state commission-guidelines structures, preserve far greater judicial sentencing discretion than the current federal system." Id. at 116. American Law Institute drafters opted to replicate state rather than federal practice when it comes to matters of judicial discretion.

An already difficult situation has been made worse, by Congress's recent passage of certain provisions in what is called the PROTECT Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (2003). This legislation includes provisions that sharply limit downward departure grounds for certain federal defendants, increase appellate court oversight of sentencing, and instruct the Sentencing Commission to take steps to reduce the overall number of downward departures. The PROTECT Act was not initiated by the Sentencing Commission. Morever, the enactment, as I understand it, took place without input from the Sentencing Commission, without its statistics, and without its consideration.

It is not my position to criticize Congress. I simply point out that this enactment will exacerbate the problems with the Guidelines by making it even more difficult for district judges to do justice under the law as circumstances warrant. We should take note of the fact that state legislatures and American Law Institute drafters have turned away from federal practice and opted for more effective sentencing structures, which give judges discretion as those persons best qualified to exercise it.

The passage of the PROTECT Act creates new and greater problems in federal sentencing. I quote from one federal judge who based his decision to resign from the bench upon this very problem:

> Every sentence imposed affects a human life and, in most cases, the lives of several innocent family members who suffer as a result of a defendant's incarceration. For a judge to be deprived of the ability to consider all of the factors that go into formulating a just sentence is

completely at odds with the sentencing philosophy that has been a hallmark of the American system of justice.

When I took my oath of office 13 years ago I never thought that I would leave the federal bench. While I might have stayed on despite the inadequate pay, I no longer want to be part of our unjust criminal justice system.

Hon. John S. Martin, Jr., *Let Judges Do Their Jobs*, N.Y.Times, June 24, 2003, at A31.

I want to conclude by making a plea to the district judges of this country who feel that they should have some say and some discretion in sentencing. Let your opinions disclose your views about the injustice in the sentencing decision or decisions you are obligated to impose by Congressional mandate and/or the Sentencing Guidelines.

Let me say further that judges generally do not object to appropriate guidelines for sentencing decisions but the time has come for major reform in the system. I say in this concurring opinion, as I have said in other sentencing opinions that I have written, "Is anyone out there listening?" United States v. Alatorre, 207 F.3d 1078, 1080 (8th Cir. 2000) (Bright, J., concurring).

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-13-